OPINION OF THE COURT
Meyer, J.
A roadblock established pursuant to a written directive of the County Sheriff for the purpose of detecting and deterring driving while intoxicated or while impaired, and as to which operating personnel are prohibited from administering sobriety tests unless they observe listed criteria, indicative of intoxication, which give substantial cause to believe that the operator is intoxicated, is constitutionally permissible, notwithstanding that the location of the roadblock is moved several times during the three- to four-hour period of operation, and notwithstanding that legislative initiatives have also played a part in reducing the incidence of driving while intoxicated in recent years. Defendant having pleaded guilty to driving while impaired after denial of his motion to suppress the evidence obtained at the roadblock, the order of the County Court, Genesee County, affirming his conviction, should, therefore, be affirmed.
I
At about 2:00 a.m. on Saturday, September 25, 1982, defendant, while driving on Route 5 in the Town of LeRoy, came up to a roadblock established pursuant to a directive of the Sheriff of Genesee County. He was directed to pull to *523 the side and there was requested by Chief Deputy Sheriff Maha to produce his license, registration and insurance card. Observing that defendant fumbled a bit with his wallet, that his eyes were watery and bloodshot and that there was a strong odor of alcohol, Maha asked whether defendant had been drinking. After defendant responded that he had just left a bar, he was asked to step out of his car. As he did so he was unstable on his feet and was unable successfully to perform heel-to-toe and finger-to-nose tests. Based on those facts and an alco-sensor breath screening test, which defendant agreed to take, Maha concluded that defendant was intoxicated and placed him under arrest.
The roadblock had been established pursuant to a March 5, 1982 memorandum of the County Sheriff which called attention to the deaths, injuries and losses occasioned by intoxicated drivers and the need “to employ every lawful means to deter and apprehend the drunken driver.” It quoted from the October, 1981 Report of the Governor’s Alcohol and Highway Safety Task Force the value of “systematic traffic checkpoints at known DWI and high accident locations during peak hours”, and the advisability that, “Such checks at specific sites * * * be of short duration, with an ability to move quickly to new sites to insure that the drinking driver will not be able to forecast checkpoint locations”, and noted that the “greatest risk is on weekend late evening/early morning hours, when one in every ten vehicles or less contains an intoxicated driver.” In succeeding detailed paragraphs it established procedures for site selection, lighting and signs; avoidance of discrimination by stopping all vehicles, or every second, third or fourth vehicle; location of screening areas off the highway to which vehicles would be directed; the nature of the inquiries to be made, with specific direction that unless the operator’s appearance and demeanor gave cause to believe him or her intoxicated sobriety tests not be given. It listed the factors to be considered and stated that neither the odor of alcohol alone nor any one of the listed factors would suffice as a basis for sobriety tests. It also directed that checkpoint sites be prescreened and that from two to four locations be used during a four-hour period.
*524 Under that procedure roadblocks were established once each month between midnight and 3:00 a.m., at locations selected in advance by senior personnel. Of the predetermined sites, four had been selected for use on September 25, 1982, the roadblock at each location being maintained for some 20 to 30 minutes before moving on to the next. Defendant was stopped at the third location in use that night. At that location warning signs were set up on the shoulders facing traffic from both directions some 300 feet in advance of the checkpoint,[1] two police vehicles exhibiting flashing roof lights were placed so that their headlights illuminated the signs, and flares were placed in the center of the road. The checkpoint was manned by 10 persons, 6 from the Sheriff’s office and 4 from the auxiliary police, and all vehicles approaching from either direction were stopped.[2] In addition, two patrol cars were stationed in the area to follow and observe for possible violations any vehicle that avoided the roadblock by making a U-turn.
Defendant moved to suppress the evidence obtained at the roadblock. After a hearing the Town Justice denied the motion, finding that it had been operated in a uniform, nonarbitrary and nondiscriminatory manner. The County Court affirmed, finding the State’s interest in curbing drunken drivers great and the operation of the roadblock sufficient to allay feelings of fright or annoyance and to circumscribe sufficiently the discretion of the personnel engaged in the operation. On appeal to this court defendant argues that deterrence is an improper purpose, that a temporary roadblock is constitutionally impermissible, and that it has not been shown that less intrusive means of enforcement would not be effective. We affirm.
II
There is, of course, no question that a roadblock or checkpoint stop is a seizure within the meaning of the Fourth Amendment (People u John BB., 56 NY2d 482, cert den 459 US 1010; People v Ingle, 36 NY2d 413; United States v Martinez-Fuerte, 428 US 543, 556; see Berkemer v *525 McCarty, 468 US _, 104 S Ct 3138, 3149; Delaware v Prouse, 440 US 648), but it is also true that there is only a diminished expectation of privacy in an automobile (United States v Martinez-Fuerte, supra, at p 561; see People v Belton, 55 NY2d 49, 53; United States v Knotts, 460 US 276, 281; United States v Chadwick, 433 US 1, 11-13) and that individualized suspicion is not a prerequisite to a constitutional seizure of an automobile which is “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers” (see Brown v Texas, 443 US 47, 51; Delaware v Prouse, 440 US 648, 663, supra; United States v Martinez-Fuerte, supra, at pp 558-562).
The permissibility of a particular practice is a function of its “reasonableness,” which is determined by balancing its intrusion on the Fourth Amendment interests of the individual involved against its promotion of legitimate governmental interests (People v John BB., supra, at p 487; United States v Villamonte-Marquez, 462 US 579; Delaware v Prouse, supra, at p 657). Of importance in that analysis are the governmental interest involved and the effect of the procedure in relation to it, on the one hand, and, on the other, the degree of intrusion of the procedure on the individual subjected to it, measured in terms of both its subjective effect and the degree of discretion vested in the officials charged with carrying it out.
The importance of the governmental interest here involved is beyond question. “The carnage caused by drunk drivers is well documented and needs no detailed recitation here” (South Dakota v Neville, 459 US 553, 558; see, also, Mackey v Montrym, 443 US 1, 17-18, n 9; Presidential Commission on Drunk Driving, An Interim Report to the Nation [1982]; Report of Governor’s Alcohol and Highway Safety Task Force [1981]; Drunk Driving Reform in New York State, 1980-1984, Report of the Subcommittee on Drunk Driving of the Assembly Transportation Committee; L 1981, ch 910, § 1 [“Because of the persistence of the problem, it is essential that the state take further steps to protect those who make use of roads from the needless deaths, injuries and property damage resulting from drunk driving”]; Ifft, Curbing the Drunk Driver Under the *526 Fourth Amendment: Constitutionality of Roadblock Seizures, 71 Georgetown LJ 1457, n 1).
Moreover, in light of the specific procedures devised and promulgated to law enforcement personnel by the head of their department, the Sheriff, and the way in which the particular roadblock was being operated when defendant was stopped, the courts below could properly conclude that it did not intrude to an impermissible degree upon the privacy of motorists approaching the checkpoint, that it was being maintained in accordance with a uniform procedure which afforded little discretion to operating personnel, and that adequate precautions as to safety, lighting and fair warning of the existence of the checkpoint were in operation (People v Peil, 122 Misc 2d 617; State v Deskins, 234 Kan 529; Little v State, 300 Md 485; State v Coccomo, 177 NJ Super 575; State v Shankle, 58 Ore App 134; cf. People v Ingle, 36 NY2d 413, supra; State ex rel. Ekstrom v Justice Ct., 136 Ariz 1; People u Bartley, 125 Ill App 3d 575; State v Hilleshiem, 291 NW2d 314 [Iowa]; Commonwealth v McGeoghegan, 389 Mass 137; State v Olgaard, 248 NW2d 392 [SD]). The fact that the plan contemplated situations in which not every car would be stopped did not affect its validity in view of the specific nondiscriminatory pattern of selection it called for (People v Estrada, 68 Ill App 3d 272, cert den 444 US 968; State v Shankle, supra) and of the reasonableness of allowing some cars to pass when traffic became congested (United States v Prichard, 645 F2d 854, 857; People v Lust, 119 Ill App 3d 509).
Nor is the plan invalid because of its deterrent purpose, the shifting of checkpoints after short periods of time, or the question raised by defendant concerning its efficiency.
The value of roadblocks in decreasing drunk driving is attested by both the United States Department of Transportation and the Governor’s Alcohol and Highway Safety Task Force. A 1983 paper on Safety Checkpoints For DWI Enforcement issued by the Department of Transportation’s National Highway Traffic Safety Administration’s Office of Alcohol Countermeasures emphasizes the importance of informing the public about DWI checkpoint operations as *527 the chief means of deterring driving while intoxicated {id., at p 26), and the Governor’s Task Force found “that the systematic, constitutionally conducted traffic checkpoint is the single most effective action in raising the community’s perception of the risk of being detected and apprehended for drunk driving” (Report, at p 103). Moreover, the Supreme Court has held deterrence to be a legitimate governmental purpose not only with respect to legislation (South Dakota v Neville, 459 US, at p 559, supra; Mackey v Montrym, 443 US, at p 18, supra; see Delaware v Prouse, 440 US, at p 660, supra), but also with respect to checkpoint stops (United, States v Martinez-Fuerte, 428 US, at p 557, supra; see United States v Villamonte-Marquez, 462 US, at p_, 103 S Ct 2573, 2579, supra). We conclude, therefore, as did the Maryland Court of Appeals in Little v State (supra) (see, also, State v Shankle, 58 Ore App 134, supra) that deterrence by fear of apprehension is a constitutionally proper means of keeping drunk drivers off the highways, though it may not be with respect to pedestrians (see People v Johnson, 63 NY2d 888).
Nor is constitutionality affected by the shifting and temporary nature of the checkpoints. The fact that the Supreme Court has approved permanent roadblocks but disapproved roving patrol stops is not determinative. What is critical is the intrusiveness of the checkpoint in relation to the governmental purpose involved. The subjective effect upon a vehicle driver approaching a roadblock is unrelated to whether it is permanent or was established but a few minutes before the driver approached it; in either instance his or her observation of it will be measured in minutes if not seconds. The likelihood of there being the kind of fright or annoyance that invalidates a random stop made by a roving patrol is obviated in the case of a temporary checkpoint by the visible signs of authority which the checkpoint entails — signs announcing the purpose, lighting, and identifiable police vehicles and the observable fact that there is a uniform system for stopping cars (United States v Hernandez, 739 F2d 484; Little v State, supra). The only subjective difference between temporary and permanent checkpoints is that because its location is known in advance the latter can be avoided *528 entirely by using a different route, but that difference is minimal as concerns anxiety, especially since a temporary checkpoint can also be avoided. Of greater importance on the other side of the equation is the fact that both the detection and deterrence purposes would be adversely affected, if not forestalled entirely, were drunk driving checkpoints required to remain in one place, the known and permanent location of the checkpoint making it easily avoidable.
Nor, finally, is there sufficient question about the productivity of DWI checkpoints to require invalidation of the procedure. The contrary argument is based on the effectiveness of the procedure as a means of apprehension and ignores entirely its deterrent effect.[3] There can be no question that substantial reductions have occurred since 1980 in the deaths, injuries and damage resulting from drunken driving. Thus, the Report of the Subcommittee on Drunk Driving of the Assembly Transportation Committee (at p 2) contains findings that highway fatalities from 1980 to 1983 decreased by 21%, while the risk of being in an accident, as measured by vehicle miles traveled, increased by 5.5%; alcohol-involved fatal accidents decreased 25% from 1981 to 1983; all accidents have declined by less than 1.5% since 1980, while reported alcohol-involved accidents have fallen at almost ten times that rate (14.5%); accidents during bar hours have declined 21.3% since 1980, while nonbar hour accidents actually have increased 3.6%; and fatal accidents during bar hours have decreased 33% since 1980, while nonbar hour fatal accidents have decreased only 11%. The extent to which those results stem from legislative reforms during that period as distinct from the deterrent effect of roadblocks and other educational and public information programs aimed at combatting the problem is not revealed, but in our view is not of constitutional moment. It is enough that such checkpoints, when their use becomes known, do have a substantial impact on the drunk driving problem (Little v State, 300 Md, at p 504, supra). The State is entitled in the interest of public *529 safety to bring all available resources to bear, without having to spell out the exact efficiency coefficient of each component and of the separate effects of any particular component (cf. Mackey v Montrym, 443 US, at p 19, supra). There being a reasonable basis for concluding that considering both its detection and its deterrence effect, the DWI checkpoint procedure in question is a valuable component of the program to control drunk driving, we conclude that it is a sufficiently productive mechanism to justify the minimal intrusion involved.[4]
For the foregoing reasons, the order of the County Court, Genesee County, should be affirmed.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler, Simons and Kaye concur.
Order affirmed.

. The guidelines called for a distance of 500 to 1,000 yards but the courts below found the change to have been approved by the Sheriff.

. Defendant disputes that all vehicles were stopped, but there being affirmed findings to that effect which have support in the record, the issue is beyond our review.

. The brief of amicus New York Civil Liberties Union states on the basis of a September, 1983 Report of the Driving While Intoxicated Unit of the New York City Police Department that less than Vio of 1% of the motorists stopped were arrested for driving under the influence of alcohol.

. The Civil Liberties Union brief points to the sentence at page 6 of the Report of the Assembly Subcommittee on Drunk Driving, stating that “highly publicized local enforcement efforts, such as random roadblocks, have prompted civil libertarians to warn of Orwellian intrusions into individual privacy,” and notes that such roadblocks were not a part of the legislative package. The Legislature is, of course, free to enact procedures authorizing such roadblocks and establishing procedures to be followed (e.g., Montana Code Ann, § 46-5-503; South Dakota Codified Laws Ann, § 32-33-12; Wyoming Stats Ann, § 7-17-103; and see State v Deskins, 234 Kan 529, at p 543, suggesting adoption of minimum uniform standards for roadblocks by the Legislature) or to proscribe the use of DWI roadblocks, if it sees fit to do so (cf. Ifft, 71 Georgetown U 1457, at p 1459, n 5). Its failure to do either is, however, of no significance in the determination of the constitutional validity of the procedure under consideration.