OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant is charged with criminal possession of a controlled substance in the third degree (Penal Law § 220.16). Pretrial Mapp and Huntley hearings were ordered and were *597 on held June 23, 1989. Police Officers Daniel Wood and James Tierney testified for the People. The parties filed memoranda of law. The motion to suppress was granted on August 1, 1989. This opinion sets out the findings and conclusions of the court.
SUMMARY OF THE TESTIMONY AND FINDINGS
Except as noted, the court credits the testimony of the two witnesses. Officers Wood and Tierney were not at the time of this incident regular partners and worked together for the first time on July 24, 1988, when, at about 9:25 p.m., they stopped a livery cab. The stop of the cab was not based on a traffic violation, but solely upon a program of the Bronx Borough Command. The program directed that on each tour of duty, officers were to stop two livery cabs, unless they were to busy too do so. No copy of the directive was introduced in evidence and the officers had never seen it. They were instructed about it when it was read to them at 10 or 15 consecutive roll calls. The purpose of the program was to protect livery cab drivers from robberies and homicides. According to Wood, the Taxi and Limousine Commission had requested "some safety” for the drivers from the police department and this program resulted. Tierney believed the program began in April 1988, but was not sure when it ended because he was never specifically told. To effect the program, each police officer in his own discretion decided which cabs would be stopped. Wood and his regular partner decided they would carry out the directive by stopping livery cabs with two people in the back seat. Even when he worked with another partner, he stopped only cabs with two passengers; that was "his personal feeling”. Wood said that on occasion he stopped more than two cabs on a tour of duty. He did not keep a record of the cabs he stopped. Tierney thought he made more than 10 stops between April 1988 and June 1989, but he could not recall how many he made.
At 9:25 p.m., Wood and Tierney were in a car parked facing north as a cab drove west across their path. The officers decided to stop the cab. They pulled out of the parking place, turned on the turret lights and activated the horn and the siren for intermittent sound. They stopped the cab at the next corner, a distance of a little less than a usual city block. In the back seat were a white man and a black man.
Wood went to the passenger side of the car and stood between the front and back doors, facing the back. He turned *598 his attention to the rear of the cab. The back window was down; the interior light of the cab was off and Wood did not recall if he was using a flashlight. He saw the black man on the driver’s side of the back seat with his hands in his lap. The defendant was sitting behind the front passenger seat. Wood saw him reach under his shirt and to his waistband.
The court notes, but does not credit, Wood’s testimony that he observed in the defendant’s hand a clear plastic bag, like a baggie, with white chunks of powder and saw the defendant drop the bag to the ground and then motion with his feet. The court notes that Wood testified that he believed that the bag contained cocaine, took the defendant from the car, removed the bag and arrested the defendant.
As Wood went to the passenger side of the cab, Tierney went to the driver’s side and spoke with the driver. Tierney told the driver about the program and that the cab was being stopped as part of the program. He did not recall if the driver responded. At that point, Tierney observed Wood open the car door and remove defendant from the car. Tierney removed the other man from the rear of the cab, but let him go.
The defendant was taken to the precinct where Wood conducted a pat down, or search, of defendant and found a small manila envelope in defendant’s shirt pocket. It contained cocaine. A beeper was also found. During this search Tierney was both filling out the arrest interview sheet and watching Wood as he searched the defendant. In the arrest report, Tierney wrote the charge as criminal possession of a controlled substance in the second degree.
Defendant was given his notice of rights at the desk and he refused to answer any questions. In the walk to the cells, Tierney and Wood discussed the quantity of drugs seized to determine the charges to file. The defendant said he had 44 grams, approximately 2 Vi ounces, for which he paid $800, and that he was selling drugs because he was out of work. In fact, that was not the correct weight.
CONCLUSIONS
I. The Defendant Has Standing to Challenge the Stop of the Cab
The stop of an automobile is a seizure (People v Scott, 63 NY2d 518, 525 [1984]; People v Sobotker, 43 NY2d 559 [1978]; People v Ingle, 36 NY2d 413, 418 [1975]) and the defendant, as a passenger in the livery cab, has an interest in the stop of *599 the vehicle, which in effect constitutes a seizure of himself. (People v Millan, 69 NY2d 514, 520 [1987]; People v Knight, 138 AD2d 294, 296 [1st Dept], lv granted 72 NY2d 862 [1988], appeal dismissed 73 NY2d 992 [1989].) The People concede this question.
II. The Stop of the Cab Was Unconstitutional
An individual vehicle may be stopped based on a reasonable suspicion of a violation of the Vehicle and Traffic Law. (People v Ingle, supra, 36 NY2d, at 419.) Routine checks of vehicles may also be made premised on reasons other than traffic violations. These checks enable the State to protect its vital and compelling interest in safety on the public highways. However, such "routine check[s] of automobiles [must be based on] some nonarbitrary, systematic procedure to verify compliance with the law. This may be done randomly, but even then by some system or uniform procedure, and not gratuitously or by individually discriminatory selection.” (Supra, at 416; People v Scott, 63 NY2d 518, supra [check point stops avoided discrimination by the stopping of all vehicles, or every second, third or fourth vehicle].) The essence of the program is uniform procedure, leaving little discretion to police officers. (People v Scott, supra, 63 NY2d, at 526; People v Valentin, NYLJ, May 23,1989, at 24, col 5 [Sup Ct, Bronx County].)
In this case, the sole reason for stopping the cab was the directive that the officers stop two cabs when that was possible. There were no guidelines, no restrictions, no standards for selection of the cabs to be stopped. Both Tierney and Wood, who but for the night of these events worked independently of each other, understood that it was in their discretion to decide which cabs to stop. The freedom left to the officers was shown in Wood’s testimony that he decided he would only stop cabs with two passengers: that was his personal feeling. In addition, the police department maintained no control over the program: no record-keeping procedures were required as shown by Wood’s admission that he did not make any. Without records, the police department could never know how many cabs were stopped, where they were stopped, which officers made stops, or anything about the circumstances disclosed by the stops. The officers were never even notified that the program had been terminated as evidenced by Tierney’s comment that he was never told when the directive was canceled. This police program here fails to supply any objective nondiscriminatory standards for enforcement and is in *600 valid under State and Federal Constitutions. (Delaware v Prouse, 440 US 648 [1979]; People v Scott, supra; People v Ingle, supra.)
The People rely on People v Judge (117 Misc 2d 912 [Sup Ct, NY County 1982]) to justify the program. Judge concludes that another program was valid because the taxicab industry is heavily regulated and a cab driver is required to cooperate with the police department. This court declines to follow Judge. First, because Judge was decided in 1982, it was uncertain that it concerned the program in this case which was instituted later. Second, Judge was written before Scott, which explicitly requires that a stop of a vehicle be based on a plan embodying explicit, neutral limitations on the conduct of individual officers (supra, 63 NY2d, at 525). Third, Judge never even cites Ingle (supra), decided seven years earlier. Finally, no matter how closely regulated any aspect of society may be, the regulator cannot violate the constitutional right to privacy. The right may be restricted in the effort to balance an individual’s privacy interest and the State’s interest in regulating a particular group or conduct (see, e.g., People v Luna, 73 NY2d 173 [1989] [border pat-down search]; Matter of Caruso v Ward, 72 NY2d 432 [1988] [urine testing of police in the Organized Crime Control Bureau]; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57 [1987] [urine testing of probationary school teachers]), but once the standard is established it must be uniformly applied without reliance on the enforcer’s discretion. (Delaware v Prouse, supra, 440 US, at 663.) Uncontrolled enforcer’s discretion invokes the application of constitutional due process and equal protection guarantees to preclude exercise of discretion based on race, ethnicity, or economic status.
III. There Is No Consent
The People assert the novel claim that the Taxi and Limousine Commission (TLC) consented on behalf of all the drivers to the program of stopping cabs. The People have the heavy burden of proving consent. (People v Gonzalez, 115 AD2d 73, 79 [1st Dept], affd 68 NY2d 950 [1986].) The consent urged here is a group consent, whereas the usual case involves the consent of an individual. However, the People’s burden of proof remains, and the People have failed to meet that burden as a matter of fact and as a matter of law.
The People’s position is grounded on the premise that the TLC had requested "some safety” for livery cab drivers from *601 the police department. The testimony about the request was given by a police officer from the 44th Precinct working the 4:00 p.m. to midnight shift. His position provides no inherent basis for concluding he had personal knowledge of the policy or working positions of the TLC. The State elicited no testimony explaining how Wood might have become privy to such information, or the source of Wood’s information. For example, it is not disclosed whether Wood’s information was merely rumor circulating in the precincts. If the State rests its claim of consent on an asserted TLC request, it must prove such a request by a witness with firsthand or otherwise reliable knowledge. (See, People v Bigelow, 66 NY2d 417 [1985]; People v Johnson, 66 NY2d 398 [1985]; People v Petralia, 62 NY2d 47, cert denied 469 US 852 [1984]; People v Landy, 59 NY2d 369, 375 [1983]; People v Havelka, 45 NY2d 636, 641 [1978]; People Lypka, 36 NY2d 210, 213-214 [1975]; see, Fed Rules Evid rule 602.) The People failed to offer such proof, and the court gives no weight to Wood’s asserted claim.
Assuming there was a TLC request as testified to by Wood, the request was for "some safety”. While the language of consent can be reasonably interpreted, the plea for assistance here is not consent to surrender the constitutionally protected right of privacy by arbitrary policy action. The Taxi and Limousine Commission’s asserted request by its own terms did not include leave to the police to use any means whatever, including unconstitutional practices, to stop crime against drivers. Consent to the program cannot be based on the alleged TLC request.
Assuming the TLC request that the police do anything, this court does not accept the proposition that the TLC can consent to surrender of the drivers’ rights. The TLC is the government agency responsible for regulating the drivers and their conduct. (NY City Charter §§ 2300, 2303.) In purpose and function the TLC as set up by the Charter is neither a union of or for the cab drivers nor their representative. The People have not introduced any evidence that the drivers have chosen the TLC to act as their agent or on their behalf with authority to present their views. Absent such an agency relationship, the TLC cannot waive the drivers’ rights. (See, People v Adams, 53 NY2d 1, 9, cert denied 454 US 854 [1981].) Even if the TLC was an authorized agent of the drivers, the TLC did not design the police program, and there is no evidence that the TLC approved the plan. Further, while the drivers as a group may waive their rights through collective *602 bargaining or other form of agreement (see, Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 119 AD2d 35, 36-37 [2d Dept 1986], affd 70 NY2d 57, 70 [1987], supra), there is no evidence of such an agreement in this case.
Finally, the People apparently argue that consent is implied from the highly regulated nature of the taxi industry and the interest of the State in aiding driver protection against crime. This theory of consent is based upon the legal concept of reduced expectation of privacy. To determine if there is a reduced expectation of privacy on the part of a group which is regulated, the courts balance competing interests: the State’s interest in the regulation and the individual’s interest in the particular privacy right affected by the regulation. (Matter of Caruso v Ward, 72 NY2d 432, 440 [1988], supra; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., supra.) In this area, the Court of Appeals has already spoken in Scott and Ingle (supra). The State’s interest in regulating its roads and the safety of its drivers does not extend to authorizing stops of cars in the uncontrolled discretion of individual police officers. The rational of Scott and Ingle applies to all drivers, cab or otherwise. Indeed, it applies to all police actions. It is therefore not legally permissible to find a consent based on reduced expectation of privacy in this case. The argument of the People has come full circle and ultimately fails.
IV. The People Failed to Establish It Was Possible to Make the Observations Which Were Asserted to Justify the Removal of Defendant From the Car and the Seizure of the Bag
Here, the testimony was that after the cab was stopped, Wood placed himself between the front and back doors of the car on the passenger side, looking into the back seat of the cab. The car window was open and he was a few feet from the defendant, who was in the-back seat. Wood testified he observed the defendant remove from his waistband a clear plastic bag containing white powder, drop the bag and move his legs.
This court finds that the asserted observations of the bag and its contents assertedly made by Wood were possible only with adequate artificial lighting. These events took place on July 24, 1988. The court takes judicial notice that sundown (Richardson, Evidence § 36, at 20 [Prince 10th ed 1973]) occurred at 8:19 p.m. on July 24, 1988. The car in this case was stopped at 9:25 p.m., more than an hour later, when natural *603 lighting was insufficient to enable Wood to see the nature of the bag or its contents as he stood beside the cab. The court declines to accept Wood’s conclusory testimony that he clearly saw the bag and its contents, for that is the finding this court must make based on a sufficient evidentiary basis.
The People have failed to establish that sufficient artificial lighting existed for Wood to make the observations that the object in the defendant’s hand was a plastic bag filled with white powder. The dome light in the cab was off. Wood did not recall if he used a flashlight. There is no evidence about street lights, or the headlights of other automobiles on the road. There was no testimony about whether the lights of the police car or the turret light were on or whether they provided any illumination for Wood. Accordingly, the People have not met their initial burden of going forward to demonstrate the legality of the officers’ conduct in the first instance. (People v Berrios, 28 NY2d 361, 367 [1971]; People v Malinsky, 15 NY2d 86, 91, n 2 [1965]; People v Aquino, 119 AD2d 464 [1st Dept 1986].)
The removal of the defendant from the car was without justification. Further, because of the rejection of the testimony concerning the bag, there is no probable cause to search the car and seize the bag from it. (People v Blasich, 73 NY2d 673 [1989].) Finally, because the arrest was illegal, the search of the defendant at the precinct which revealed a manila envelope of drugs and the defendant’s statement at the precinct are also suppressed.