OPINION OF THE COURT
Lorin Duckman, J.
Defendant, Olenzia Evans, has been charged in an informa *961 tian with driving a motor vehicle while under the influence of alcohol pursuant to Vehicle and Traffic Law § 1192 (3).
The arrest took place on July 6, 1991 at Devoe Avenue and 180th Street in Bronx County, at a roadblock set up in connection with "Operation John,” a campaign designed to deter people from picking up prostitutes.
CONTENTIONS
The defendant alleges the stop of his vehicle was illegal because the roadblock was unconstitutional. He seeks suppression of any observations made by the police officer of his physical condition or appearance, any statements that were obtained from him, as well as evidence of his refusal to take a breathalyzer test and the results of the aborted coordination tests.
Defendant argues that the People failed to prove that the State’s interest in preventing the patronizing of prostitutes justified the intrusion on the privacy rights of passing motorists. He contends that a roadblock, even if conducted in a nonarbitrary and nondiscriminatory manner, constitutes an impermissible intrusion if there is insufficient proof that it was established to promote a sufficiently important,-legitimate governmental interest. While conceding that patronizing a prostitute is against the law, this concern of the police to enforce the law was never proven to be of tantamount importance to outweigh an individual’s right to be free from an intrusion by the State. (See generally, People v Ingle, 36 NY2d 413, 416 [1975].)
The defendant also complains that no empirical data was introduced showing that the area was frequented by prostitutes and no studies were conducted showing how prostitution would be deterred by a roadblock at Devoe Avenue and 180th Street. Also missing from the proof was a demonstration of a relationship between the traffic in the area and the presence of people soliciting prostitutes.
Defendant further moves to preclude use of statements on the ground that the People failed to provide sufficient notice pursuant to CPL 710.30 (1) (a).
At the arraignment on July 7, 1991, the prosecutor stated: "[A]t this time, People serve notice pursuant to Section 710.30 (1) (a), defendant stated in substance, 'What are you arresting me for? I only had two beers.’ ”
Sometime later, well beyond the statutory 15-day period *962 (see, CPL 710.30 [2]), the People advised the defense counsel that this statement was made twice spontaneously, just before defendant was arrested and again at Highway One, after the administration of Miranda warnings.
Defense counsel was also advised that defendant made additional statements at Highway One concerning the amount of sleep he had the night before, the amount of food he ate, and the locations he was driving from and to. As to the statements made after Miranda warnings, defendant contends that he was never advised of any of his constitutional rights and that he never waived his right to remain silent.
HEARING
Testimony was taken on two days, October 9, 1991 and October 21, 1991. Two police officers testified, Police Officer Lynch of the 48th Precinct and Police Officer Venturella of Highway One. Their testimony was straightforward and credible.
A videotape of defendant being advised of Vehicle and Traffic Law § 1194 warnings was admitted into evidence.
FINDINGS OF FACT
Operation John
On July 6, 1991, Police Officer Lynch was in uniform, on a job called "Operation John.” In response to an alleged prostitution problem, a roadblock was set up on Devoe Avenue. Whether the problem pertained to public health, morals or highway safety was never defined.
All traffic was blocked from traveling southbound and all motor vehicles (including five buses) heading northbound on Devoe Avenue were stopped. Drivers were asked to produce paperwork, consisting of license, registration and proof of insurance. Equipment on the vehicles was also checked. Summonses were issued to any drivers failing to have the proper documents or for operating cars with faulty equipment.
No questions, other than the request for paperwork, were asked of the drivers and none of the vehicles were inspected for the presence of prostitutes.
The purpose of "Operation John,” according to Police Officer Lynch’s testimony, was to use the "omnipresence” of police officers to deter people from picking up prostitutes. In Police *963 Officer Lynch’s opinion, the observation by people of police officers would stop the solicitation of prostitutes.
Though Police Officer Lynch had been assigned to conduct this roadblock 10 or 12 times, he knew of no written guidelines or official policy of the New York City Police Department which either authorized the operation or directed how it should be conducted. There were no set times for the roadblock to open or close, the decisions being made on an "ad hoc” basis at the scene.
Moreover, Police Officer Lynch was unaware of any studies showing that a roadblock in this area (or any other) had any effect on prostitution. Nor could he say that the use of a checkpoint at which the license and registration of all drivers would be examined was more effective than any other method. Other than the conclusory statement in his testimony that there was a precinct condition involving prostitutes and those who solicit them, no empirical proof was presented to show the location or the magnitude of the problem.
The Arrest
At around 11:20 p.m., Police Officer Lynch signaled the defendant’s car to stop. Defendant stopped his car near another police officer. When the officer requested his license and registration, defendant began to yell at her.
Police Officer Lynch, who was standing 10 feet away, heard the yelling and approached the defendant’s car. The defendant stared blankly at him. After smelling alcohol on defendant’s breath, Police Officer Lynch asked him to exit the car.
Defendant swayed back and forth as he exited, spun around and placed his hands behind his back as if he was going to be arrested. As handcuffs were placed on his wrists, defendant said that he only drank three beers and that he had eaten hot dogs at Coney Island.
Processing
Defendant was taken to the 48th Precinct and then to Highway One. Miranda warnings were read to him by Police Officer Lynch from a card at Highway One. Defendant then admitted that he had consumed two beers, in addition to providing pedigree information and statements about how much he had eaten, how much sleep he had, and where he was driving from and to.
*964 After being given his breathalyzer warnings, defendant refused to take the chemical test. He began the coordination tests, but quit part way through after requesting an attorney. The test was halted.
THE LAW
Roadblocks
The stop of a car by police officers is a "seizure” within the meaning of the Fourth Amendment. (Delaware v Prouse, 440 US 648, 653-655 [1979]; People v Sobotker, 43 NY2d 559 [1978].)
Generally, police officers may stop an individual automobile if there is reasonable suspicion the driver has violated the Vehicle and Traffic Law. Absent a minimal degree of such suspicion, a "routine traffic check” may be conducted only according to nonarbitrary, nondiscriminatory, uniform procedures, such as roadblocks, checkpoints and weighing stations. (People v Ingle, 36 NY2d 413 [1975], supra.)
The permissibility of the particular police conduct is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests. (Delaware v Prouse, supra, at 654.) The reasonableness of the police conduct should be measured by balancing the need to search or seize against the invasion which the action entails. (Terry v Ohio, 392 US 1 [1968].) The mere identification of a situation which seems to give rise to a need to search or seize is not enough; proof must be offered that a problem worthy of such interference does in fact exist. (See, People v Evans, 147 Misc 2d 811, 813, n 1 [Sup Ct, NY County 1990].)
Therefore, police may stop vehicles at roadblocks or vehicle checkpoints as a means of enforcing regulations relating to the use of vehicles on public highways. (People v Scott, 63 NY2d 518 [1984].) "[T]he interest of the State in insuring highway safety outweighs the minor intrusion caused by nonarbitrary, uniform and systematic inspection * * * Hence, stops and inspections at roadblocks, checkpoints, weighing stations, and the like, satisfy constitutional requirements”. (People v Ingle, supra, at 420.)
The deterrence and detection of intoxicated drivers is a permissible reason for establishing a roadway checkpoint. *965 (People v Scott, supra.) In People v Scott (supra), the legitimate government interest supporting the nonarbitrary stopping of motorists to identify drunk drivers was supported by a memorandum from the County Sheriff which called attention to the deaths, injuries and losses occasioned by intoxicated drivers, as well as a report of the Governor’s Highway Safety Task Force, which not only recognized the problem, but recommended a specific procedure for carrying out the stops. (People v Scott, supra, at 523.)
Roving roadblocks, conducted in a uniform, nonarbitrary and nondiscriminatory manner, to obtain information concerning a series of burglaries committed in a remote rural area and to identify the occupants of the cars were also held to be permissible. (People v John BB., 56 NY2d 482, 488-489 [1982].) The fact that the utilization of traditional law enforcement techniques would not have been meaningful in light of the large area in which the investigation was conducted, as well as the State’s interest in apprehending the persons who victimized summer homes during the winter months when the owners were away, justified the use of roadblocks.
"Although not controlling, the elimination of the element of arbitrariness has been identified time and again as a critical factor in determining the reasonableness of official investigative activity of an intrusive nature”. (People v John BB., supra, at 488 [emphasis added].) Guidelines to direct the officers about whom to stop and what type of investigation to conduct must also be provided. (See, People v Genn, 144 Misc 2d 596 [Sup Ct, Bronx County 1989].)
Discussion
The People have established that every vehicle traveling northbound on Devoe Avenue was stopped. They have established that motorists were warned by the strategic placement of pylons that a roadblock had been set up; and they have also established that drivers of all of the vehicles which were stopped were asked for licenses, registrations, and insurance papers as the cars were being checked for equipment violations.
However, this limited presentation of proof is not sufficient to sustain the People’s burden of showing that the roadblock set up to deter the solicitation of prostitutes which led to the stop of Mr. Evans’ vehicle and to his subsequently being observed in an intoxicated condition was legal. (People v *966 Malinsky, 15 NY2d 86 [1965]; People v Berrios, 28 NY2d 361 [1971].)
Though testimony was introduced that a prostitution problem existed somewhere in the precinct, neither the exact nature of the problem nor the precise area where it existed was offered. In fact, it was never established that the location of the roadblock was prostitution prone. Certainly, the incidence of a particular crime in an area is a factor to consider in determining the reasonableness of conduct employed to eradicate it. But that assertion alone, that a precinct condition existed, by a patrol officer, will not allow the Fourth Amendment requirement of reasonableness to be dispensed with.
Before any balancing test can be conducted to determine if the public interest in the problem warrants invading a driver’s right to travel the roads unimpeded, the precise nature of the evil sought to be erased must be identified and defined. The greater the evil, when added to a clearly defined and recognized public interest, the more likely the intrusion would be permissible. Without this proof, no determination can be made that a roadblock was needed or that there existed a reasonable relátionship between the location of the roadblock and the times it was enforced.
Further, Police Officer Lynch was not aware of any guidelines or procedures to follow. He knew of no standards controlling the times the roadblock would open or close; in fact, this decision seemed to have been made arbitrarily. Without testimony regarding such instructions, it cannot be determined if the stops were carried out pursuant to a strategy developed at a high enough policy level at which the need to interfere with an individual’s freedom was acknowledged, and at which the procedures adopted were examined and found to cause minimal intrusions, while presenting a reasonable likelihood of success.
Proof that five buses were stopped suggests that this analysis was not done. What interest was served by asking a bus driver for his paperwork or what benefit was derived from stopping buses or cars driven or occupied by women and children was never explained.
Despite the fact "Operation John” type roadblocks had been used at least 10 or 12 times, no records were offered showing the success of the prior operations. More importantly, no records were kept on July 6, 1991. Absent this information, there is no way to know if procedures, if they were established, were followed.
*967 Utilizing neutral criteria to support the stopping of all vehicles on a thoroughfare, though laudable, is not enough to validate a roadblock. Were this the case, all that the commanding officer of a precinct would have to do is identify a problem on a street within his command — say street sales of small amounts of drugs for example — and then stop all cars and people entering the area. (Cf., Brown v Texas, 443 US 47 [1979].) Our Constitution requires a balancing of many more interests before the right to privacy succumbs to the exercise of police power, however uniform and nondiscriminatory and however well-meaning!
Did the police set up the roadblock because the beckoning actions of provocatively dressed pedestrians in the area caused cars to stop, thereby creating a dangerous traffic condition? Was the reason for the roadblock to eliminate the public disturbance caused by people engaged in prostitution related activities? Or, was the purpose of the stops to reduce the spread of sexually transmitted diseases by deterring drivers from engaging in sex for hire?
While these goals are arguably ones in which the public, in varying ways, has identifiable interests, none were claimed to be an objective of "Operation John.” It is these or similarly related goals which, if properly proved, could support stops made without individualized suspicion. In the absence of such proof, no determination can be made if the public interest in arbitrating morality or promoting public health and safety warrants the inconvenience and intrusion, albéit minimal, caused by the checkpoints.
"Operation John” was not a planned maneuver, like the one in People v John BB. (supra), which was set up in response to the recent commission of felonies in a rural area. "Operation John” was not designed to arrest suspects for a known crime or even to discover evidence of crimes which were difficult to detect except upon close-up visual inspection. (See, People v Scott, supra.)
"Operation John” wasn’t set up to find someone who committed a crime or even to identify someone who intended to commit one. As noted in Police Officer Lynch’s testimony, the checkpoint was not utilized to check the vehicles which were stopped for the presence of prostitutes.
The police interest in the specific vehicles which were stopped was not genuine. While the cars were examined for equipment violations and the drivers for having proper paper *968 work, this was not the objective of the mission. Furthermore, no proof was offered that summonses were issued. Though such routine checks, based on the State’s interest in safety on the highways may be permissible under People v Ingle (supra, at 420), equipment checks of all passing cars should not be used as a pretext to justify an otherwise unconstitutional police action. (See generally, People v Flanagan, 56 AD2d 658 [2d Dept 1977]; People v Llopis, 125 AD2d 416 [2d Dept 1986].)
The only stated purpose of the roadblock was to deter people from picking up prostitutes by having an "omnipresence” of police in the area. If the plan was to stop the solicitation of prostitutes by placing police officers in positions where they could be observed and not to inspect the cars for illegal activity, then there was no need to stop the vehicles and no acceptable legitimate public interest served by doing so.
It is clear from Police Officer Lynch’s testimony that the goal of deterring the solicitation of prostitutes was to be achieved by the harassment of passing motorists, none of whom had been identified as prospective purchasers. This is not a permissible reason to allow police interaction with citizens who are otherwise apparently driving legally on public thoroughfares. (People v De Bour, 40 NY2d 210, 220 [1976].)
Therefore, since the stop of Mr. Evans’ vehicle violated the constitutional proscription against unreasonable stops, the visual, olfactory and auditory observations made by Police Officer Lynch which led to defendant’s arrest must be suppressed along with any other evidence, including defendant’s statements, which were obtained as a result of the illegal arrest.
In view of this decision, there is no need to reach the issue concerning the statement notice. However, if the court were to decide that issue, the only statements which the People would be permitted to introduce on their direct case would be those for which notice was given at arraignments. (People v O’Doherty, 70 NY2d 479 [1987].) To the extent that a later statement suggests that a different number of beers were consumed, that statement is admissible. However, any statements relating to where the beer or food was consumed, the time or location of the meal or any other information which is contained in the 127 report are not admissible because notice of them was not provided within the statutory time.