People v Bigger (2004 NY Slip Op 24005)

People v Bigger

2004 NY Slip Op 24005 [2 Misc 3d 937]

January 10, 2004

Justice Court Of Town Of Webster, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, May 12, 2004

[*1]
The People of the State of New York, Plaintiff,
v
Gregory Bigger, Defendant.
Justice Court of Town of Webster, Monroe County, January 10, 2004

APPEARANCES OF COUNSEL

Fiandach & Fiandach (Sylvia W. Josh of counsel), for defendant. Howard R. Relin, District Attorney (Amy Bogardus of counsel), for plaintiff.

{**2 Misc 3d at 937} OPINION OF THE COURT

Thomas J. DiSalvo, J.

{**2 Misc 3d at 938}Findings of Fact

The defendant was charged on September 27, 2003 with two misdemeanors, to wit: driving while intoxicated, per se, Vehicle and Traffic Law § 1192 (2), and common-law driving while intoxicated, Vehicle and Traffic Law § 1192 (3). The defendant was arraigned on October 15, 2003 in the presence of his attorney. At the time of the arraignment, defense counsel submitted omnibus motions, wherein she requested a probable cause hearing, Huntley hearing and Scott hearing. The hearings were held on December 12, 2003. The defendant contended, among other things, that the stop of his vehicle violated his right to be free of unreasonable searches and seizures pursuant to the Fourth Amendment to the United States Constitution and article I, § 12 of the New
York State Constitution. At the conclusion of the hearing, the motion to suppress the evidence in this matter, as being obtained as a result of an unconstitutional sobriety checkpoint, was denied.
[*2]
In addition, the motion to suppress the alleged admissions of the defendant as being involuntarily made was also denied. However, this court reserved on the issue of reasonable cause to stop the defendant. The defendant was not charged with any violations of the law, other than the two charges of driving while intoxicated. The officer stopped the defendant for the sole reason that he believed the defendant had been attempting to evade the sobriety checkpoint, which had been established on Bay Road, north of Thomar Drive.
On the evening of September 26, 2003, a sobriety checkpoint was established by the Webster Police Department, presumably, just south of New York Route 104 and north of Thomar Drive. At approximately 11:41 p.m. on September 26, 2003, the defendant was originally observed by Sergeant Kevin Hall of the Webster Police Department. Sergeant Hall was heading westbound on Thomar Drive, when he saw the defendant's vehicle, which had been heading northbound on Bay Road, make a right turn onto Thomar Drive, heading eastbound on said street. The defendant then turned into a driveway, backed out of that driveway, and then proceeded to head back toward Bay Road. Upon arriving at the corner of Thomar Drive and Bay Road, the defendant made a left turn onto Bay Road heading southbound away from the sobriety checkpoint. At that point Sergeant Hall pursued and stopped the defendant's vehicle. Sergeant Hall testified that the basis of the stop was the belief that the defendant was attempting to avoid the sobriety checkpoint.{**2 Misc 3d at 939}
Upon exiting his patrol car, Sergeant Hall approached the defendant, who was driving the vehicle in question. Sergeant Hall asked the defendant for his driver's license and registration. The officer testified that although these documents were retrieved by Mr. Bigger, he did so very slowly. The officer asked the defendant where he was going. The defendant responded by [*3]saying he was "on his way to a friend's house in Ontario" (Wayne County). He further indicated that he turned around when he saw the lights.
In speaking with the defendant, Sergeant Hall observed the defendant as having a strong odor of an alcoholic beverage, watery and bloodshot eyes. Mr. Bigger told Sergeant Hall that he had a "few beers at 4:00 p.m." The defendant was asked to recite the alphabet, without singing, from "L" to "T." However, the defendant recited from "H" to "Z." Sergeant Hall testified at the hearing that at that point he believed the defendant was driving "under the influence" and called for backup from one of the officers at the sobriety checkpoint. He remained at the scene until Officer Rose of the Webster Police Department arrived.
Officer Rose gave the defendant the "standard greeting" as required by the Sobriety Checkpoint Directive of September 26, 2003 to September 27, 2003. He asked the defendant if he had anything to drink that night. The defendant responded by saying he had three to four beers between 3:00 p.m. and 6:00 p.m. He further indicated that he then took a nap, that he was currently on his way to see a friend, and that when he saw the lights from the sobriety checkpoint, he thought there was an accident ahead and turned around to go home.
Officer Rose testified that the defendant exhibited some of the standard indicia of intoxication. As a result, he ordered the defendant to exit his vehicle. Subsequent to exiting his vehicle the defendant was asked to perform various roadside tests. The defendant failed some of the roadside tests, including the finger-to-nose test and the one-leg stand. The prescreen test was positive for alcohol. The defendant was then arrested and taken to the Webster Police Department for processing.

Issue Presented.

[*4]
Does a police officer, not part of a sobriety checkpoint, have reasonable cause to stop a vehicle, solely on the basis that it appears that the driver of that vehicle is attempting to evade a sobriety checkpoint?{**2 Misc 3d at 940}

Legal Analysis.

The statute that applies to this particular situation is Criminal Procedure Law § 140.50 (1) which states:
"In addition to the authority provided by this article for making an arrest without a warrant, a police officer may stop a person in a public place located within the geographical area of such officer's employment when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct."
However, that section of the law begs the question as to what constitutes a "reasonable suspicion" that an individual is or about to engage in criminal activity. The United States Supreme Court in Terry v Ohio (392 US 1, 21 [1968]) stated as follows:
"And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? Cf. Carroll v. United States, 267 U.S. 132 (1925); Beck v. State of Ohio, 379 U.S. 89, 96-97 (1964). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. See, e.g., Beck v. Ohio, supra; Rios v. United States, 364 U.S. 253 (1960); Henry v. United States, 361 U.S. 98 (1959). And simple ' "good faith on the part of the arresting [*5]officer is not enough." . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would {**2 Misc 3d at 941}be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' Beck v. Ohio, supra, at 97."
Thus a police officer must have an objective "articulable" fact on which to rely before that officer makes an investigatory stop of an individual. This was reaffirmed by the New York State Court of Appeals in People v Ingle (36 NY2d 413, 420 [1975]) wherein the Court stated that
"It should be emphasized that the factual basis required to support a stop for a 'routine traffic check' is minimal. An actual violation of the Vehicle and Traffic Law need not be detectable. For example, an automobile in a general state of dilapidation might properly arouse suspicion of equipment violations. All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion' (Terry v Ohio, 392 US 1, 21, supra)." (Emphasis added.)
In this Department the governing case is People v Chaffee (183 AD2d 208 [1992]). In that case, the Court permitted the stop of a vehicle by a Trooper who was involved in a sobriety checkpoint. The vehicle in that case "made a 'very quick stop' in the road and turned right into a motel parking lot. The Trooper followed that car into the lot and observed that it circled the lot two times, passing numerous parking spaces. The occupants were looking toward the roadblock. It was only after the Trooper activated his roof lights that the car pulled into a parking space." (Chaffee, supra at 209.) The result was that the driver of that vehicle was eventually arrested for felony driving while intoxicated. The articulable fact which permitted the investigatory stop was that the defendant "appeared to be avoiding the checkpoint." (Chaffee, supra at 211.)
However, in People v Rocket (156 Misc 2d 641 [1992]), the court held [*6]that the stop of a vehicle, which merely turned off one public highway onto another such highway, without any alleged violation of the Vehicle and Traffic Law, resulting in the avoidance of a sobriety checkpoint, was not a permitted stop. The court stated that "Even if a defendant is intentionally avoiding a checkpoint police officials would not be cognizant of that fact other than by mere conjecture." (Rocket, supra at 643.) The court further indicated that "While there are a number {**2 Misc 3d at 942}of cases which suggest that the avoidance of a checkpoint is in fact an articulable reason for a stop . . . it appears that the prevailing view and that more consistent with the articulations made by the United States Supreme Court is that the mere making of a U-turn or turnoff to avoid a . . . checkpoint is not, in and of itself, sufficient basis for a stop." (Rocket, supra at 644; see also, Michigan State Police v Sitz, 496 US 444 [1990].)
In People v Scott (63 NY2d 518, 524 [1984]) the Court of Appeals noted, that in that case "two patrol cars were stationed in the area to follow and observe for possible violations any vehicle that avoided the road block by making a U-turn." One must note that the guidelines established in that case permitted only the following and observation for possible violations of any vehicle that avoided the checkpoint. The U-turn, in and of itself, did not in the Scott case amount to a reason to stop any vehicle. In other words, if not normally prohibited at that site, a legal U-turn was not an articulable reason to stop a vehicle. (See also, Gerstanzang, Handling the DWI Case in New York § 5.5 [2002-2003 ed] ["Checkpoint Evasion"].)
In the instant case, neither general order 504 nor the Sobriety Checkpoint Directive for September 26, 2003 to September 27, 2003 provided for a situation involving a driver [*7]who may appear to be evading the checkpoint.[FN*]

In fact, neither document establishes a procedure for dealing with drivers who may be attempting to evade the checkpoint. The sine qua non of a nonarbitrary procedure for operating a sobriety checkpoint is to eliminate the discretion of the officers operating that checkpoint as to which cars to stop. (See People v Scott, 63 NY2d 518, 525 [1984].)
The testimony elicited at the pretrial hearing indicated that no procedure was in place to deal with drivers who attempted to avoid the checkpoint in general or specifically by turning down one of the three side streets that preceded the sobriety checkpoint. In fact, Sergeant Small, who was the road patrol supervisor that evening, testified at the hearing on cross-examination, that the department has no specific policy for "turn-a-rounds" and that no instructions had been provided {**2 Misc 3d at 943}to the officers prior to establishment of the sobriety checkpoint in question. Thus, it would appear that the officers had discretion as to whether to pursue or not pursue vehicles turning away from the checkpoint or down one of the three streets off of Bay Road just south of the sobriety checkpoint. Sergeant Hall testified that he was not part of the sobriety checkpoint detail. In fact, as previously stated, he was on normal road patrol heading westbound on Thomar Drive, which according to the sergeant is approximately a "couple of hundred yards" from where the sobriety checkpoint was located, when the defendant made a turn from Bay Road onto Thomar Drive. That is when the chance encounter between Sergeant Hall and Mr. Bigger took place. The officer then decided to follow that particular individual at that particular time.
[*8]
The holding by the Fourth Department in People v Chaffee (183 AD2d 208, 209 [1992]) is specifically limited to a situation involving "a police officer, who is participating in a sobriety checkpoint." That is not the set of facts presented in the case currently before this court. A road patrol officer not part of the sobriety checkpoint could not be said to have the authority to stop every vehicle approaching or attempting to avoid the sobriety checkpoint. He must have an independent articulable reason to stop an individual vehicle. "[I]nnocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand." (People v De Bour, 40 NY2d 210, 216 [1976].) The Court of Appeals also stated that "The police may not justify a stop by a subsequently acquired suspicion" (De Bour, supra at 215).
In this case, all we have is an individual driving his vehicle in no apparent violation of any law. We have a police officer not part of a sobriety checkpoint, and thus not subject at that time to the department's general order or current directive, stopping a vehicle on the mere supposition that the driver of that vehicle is attempting to evade the sobriety checkpoint.
The stop in question is flawed on three counts. First, the officer did not have an objective articulable reason to stop the defendant's vehicle. Thus he lacked "reasonable suspicion" as required by CPL 140.50 (1) to stop the vehicle in question. Second, the officer executing the stop was not part of the sobriety checkpoint. Third, there was no written established procedure for the stopping of vehicles that appeared to be avoiding{**2 Misc 3d at 944} said sobriety checkpoint. Therefore, the charges against the defendant are dismissed because the stop of the defendant's vehicle was not justified.

Footnotes

Footnote *: General order 504 and the directive for September 26, 2003 to September 27, 2003 were both entered into evidence by the People, without objection by the defense. General order 504 was signed by the previous Webster Police Chief, Scott J. Parsons. Said general order became effective on November 14, 2000.