OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant is charged with criminal possession of a controlled substance in the fourth degree and the fifth degree and criminally using drug paraphernalia in the second degree. Another IAS Judge granted a pretrial Mapp and Huntley/ Miranda hearing to determine whether property seized from the defendant and from a room that was searched as well as a statement made by the defendant should be suppressed. That hearing was held before this court on November 25, 1992. Detective Daniel Crane testified for the People. The defendant testified on her own behalf and called as a defense witness Thomas Blakeny. The motion is granted in part and denied in part. The narcotics found in the room of the social club and in the defendant’s purse and her statements are suppressed. The drug paraphernalia found in the room is not suppressed.
THE TESTIMONY

The Prosecution Witness

Detective Crane, a New York City police officer with Bronx Narcotics, was temporarily assigned to the Mayor’s Social Club Task Force set up after the Happy Land Social Club fire. He was part of a team to inspect social clubs. Crane believed it was the job of the Fire Department to examine every room, closet or separation during an inspection, but he was not trained in fire inspection. His role on the team was to protect the fire officials and to provide security in case there was a problem or if someone refused to cooperate with fire officials. On November 3, 1991, Crane was in uniform and part of a team that included another uniformed police officer, three or four plainclothes officers, a sergeant and one fireman.
At about 2:00 a.m.. Crane and the team were at 1771 *928 Southern Boulevard, a structure of several connected commercial buildings, which included a social club. The entry had a doorway and a blacked-out window. A steel gate was rolled up. The front door was locked and Crane knocked announcing it was the Police Department and they were present to do a fire inspection. They had no warrant. A man opened the door.
In the club, there were tables, a bar, a pool table, and a pinball machine. The lights were on and music was playing. In attendance were approximately 15 to 18 people who were drinking or playing pool or pinball. In the back of the club there were rest rooms and a hallway. On the left of the hallway was a door leading to a back room. A door at the rear of the hallway led to the outside.
The fireman checked the back door, the bathrooms, and behind the counter. The police officers walked around. Crane saw defendant and Gabriella Byrd come from the room off the hallway. Defendant locked the door to the room and put her set of keys, including her personal keys, on the counter of the bar. There was no suspicious conduct.
Crane did not recall speaking to the fireman or getting any instructions from him. He tried to open the door to the room and when he could not get in, Crane took the defendant’s keys from the bar, opened the door and entered the room. The fireman, said Crane, would have had to get into that room to see if there were "flammables” and another exit. Although not trained to do an inspection, Crane testified it was he who opened the door and entered the room to do the inspection. There was no testimony that the fireman ever entered the room, although another police officer might have done so. On a desk in the room, Crane saw two plastic bags containing cocaine, a strainer, a measuring spoon and a plastic envelope containing other plastic envelopes. Also on the desk was $895.
Defendant was arrested. She asked for her purse and Crane retrieved her purse from one of the shelves in the room. When he searched the bag prior to giving it to the defendant, he found seven envelopes of cocaine. Defendant was handcuffed and told Crane "she just worked there.” The statement was not made in response to questions.
Crane vouchered four keys that fit the lock to the club and returned the others to the defendant. He did not know if any citations for fire violations were issued.

The Defense Witnesses

The defendant testified on her own behalf. She said that the *929 social club was a membership club to which she had belonged and at which she had worked for several days in October 1991, the month before the inspection. She and the owner of the club, Thomas Blakeny, were friends and had seen one another when they were both on separate visits to North Carolina. While they were in North Carolina, Blakeny asked defendant to bring $3,000 back to New York to pay a contractor, named Walter, who was doing renovations at the club and to pay other expenses. She arrived at the club after the flight home from North Carolina. At that time, because the club was under reconstruction, it was closed to the public, and was dusty and messy. The ceiling was being lowered and sprinklers put in. Using the key to a back room given to her by Blakeny, she entered the room to count the money. She left the room after only counting part of the money and closed the door to the room, which automatically locked it. She put her keys on the bar. Afterward, the police and fireman entered the club. They looked around. Defendant showed the fire official that the back door leading to the outside was open. One of the police officers, without her permission, picked up the key, opened the door to the room, took her into the room and then handcuffed her. She was told she was arrested for possession of drugs.
The defendant testified she was not working at the club that night, that her purse was in the room and that she never made any statement that "she was in charge.”
Mr. Blakeny testified he had seen defendant, who was his friend, in North Carolina. He gave her the keys to the club and his home and about $2,500 to pay the contractor doing renovations on the club.
FINDINGS AND CONCLUSIONS
1. The Defendant Has Standing to Challenge the Seizure of the Narcotics.
Before discussing the merits of the suppression question, it is necessary to determine whether the defendant has standing to challenge the legality of the seizure of the drugs from the back room of the club. Although there is no question that the defendant has a privacy interest in her purse that justifies her right to challenge the search of it, the basis for her standing to challenge the seizure of the drugs from the back room cannot be based on a privacy interest. Counsel at the hearing stated that she had no such interest.
*930 Nonetheless, defendant has standing to challenge the entry into the back room and the seizure of the drugs there. Her standing is premised on the use by the People of the statutory presumption of possession found in Penal Law § 220.25 (2).[1] Principles of fairness allow the assumed possessor to challenge the seizure. (People v Millan, 69 NY2d 514 [1987].) The People relied on the presumption before the Grand Jury, and, although they equivocated at the hearing, never expressly disavowed the use of the presumption at trial. Although the defendant has standing to challenge the seizure of the drugs, the presumption does not apply to paraphernalia and therefore the People may use that evidence.
2. The People Failed to Prove the Seizure of the Drugs from the Room was Valid under the New York State Constitution.
After a defendant has made a challenge to the admissibility of evidence, he or she bears the ultimate burden of proving that the evidence should be suppressed. However, the People must first show that the police conduct was reasonable and therefore they have the burden of going forward in the first instance to show the legality of police conduct. (People v Berrios, 28 NY2d 361, 367 [1971].) Here, there was no warrant and no probable cause to search either the social club or the smaller locked room. The prosecution relied upon the validity of an administrative search, the fire inspection, to justify the police seizure of the drugs. Accordingly, the People had the burden of coming forward to prove the administrative search was valid and they were required to meet that burden by producing evidence of the rules regulating the official conduct in carrying out the inspection. (People v Keta, 79 NY2d 474, 499-500 [1992].)
Administrative searches, conducted without probable cause and a warrant, must be circumscribed by rules to guarantee the certainty and regularity of governmental action. It is such a guarantee that provides a constitutionally adequate substitute for the absent warrant. (People v Keta, 79 NY2d, supra, at 499, 502.) Administrative searches may be based on an objective reason with respect to a particular individual or place that is less than probable cause and is justified by the State’s interest. (See, e.g., People v Luna, 73 NY2d 173, 178- *931 179 [1989] ["some suspicion” for patdown at the border]; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57 [1987] [reasonable suspicion to require drug testing of a teacher].) Alternatively, the State’s interest may be great enough to justify an administrative search without an objective reason to focus on a particular individual or place if the subject of the intrusion is closely regulated and if there is a "non-arbitrary, uniform and systemic inspection” so as not to leave police discretion wholly untrammeled. (Matter of Caruso v Ward, 72 NY2d 432 [1988]; People v Scott, 63 NY2d 518 [1984]; People v Ingle, 36 NY2d 413, 420 [1975]; People v Vails, 170 AD2d 550, 551 [2d Dept 1991]; People v Genn, 144 Misc 2d 596 [Sup Ct, Bronx County 1989].)[2] Thus, random intrusions without individualized reasonable suspicion are permitted where the privacy interest is minimal, the government’s interest is substantial, and safeguards are provided to ensure that the individual’s reasonable expectation of privacy is not subjected to unregulated discretion. The intrusions must be constrained by regulations embodying explicit, neutral limitations on the conduct of individual officers, providing meaningful limitations on otherwise unlimited discretion and minimizing the risk of arbitrary or abusive enforcement. (People v Keta, 79 NY2d, supra, at 500, 501-502.)
The importance of the governmental interest in the inspections carried out to enforce fire laws in buildings, especially those that are places of public assembly, cannot be questioned. The Happy Land Social Club fire and its disastrous results need no elaboration. The New York City Charter and the building and fire safety regulations in the Administrative Code of the City of New York reflect the attention given to the safety and security of buildings and the pervasiveness of the regulation. (NY City Charter §§ 481-494 [Fire Department]; NY City Charter §§ 641-649 [Department of Buildings]; Administrative Code §§ 15-101 — 15-304 [Fire Prevention and Control]; Administrative Code §§ 26-101 — 26-708 [Housing and Buildings]; Administrative Code §§ 27-101 — 27-4283 [Construction and Maintenance], particularly §§ 27-522 — 27-549 [Building Code’s regulations of Places of Assembly], and §§ 27-4001 — 27-4283 [Fire Prevention Code] and § 27-4256 [Places of Public Amusement].)
*932 The concern about safety in social clubs was reflected in the establishment in 1990, as a result of the Happy Land fire, of a temporary Commission on Social Clubs as well as enhanced sanctions for violation of Fire Code regulations, now included in Administrative Code §§ 15-227, 15-227.1, 26-127, 26-127.1 and 26-249. Further, the definition of place of assembly in section 27-232 was modified to expand those places included in the definition.
The problem here lies not with the substantial nature of the public interest, but with the failure of the prosecutor to offer any proof of the regulations or rules that controlled the conduct of the officials who undertook this search. No reference was made by the People at any point in this proceeding to any rule or ordinance, published or unpublished, that set out the prescribed procedures for conducting fire or building inspections. As is required, this court takes judicial notice of the New York City Charter, Administrative Code, local laws, ordinances, Health Code, resolutions and all rules and regulations adopted by law (CPLR 4511 [a]; Administrative Code § 1-104 [a]),[3] to determine if there are regulations that will meet the People’s burden. Despite this aid to the People, their burden of proof remains unsatisfied.
The Fire Commissioner, as well as the Commissioner of Buildings, is responsible for enforcing the Building Code. (Administrative Code § 27-106.) The Fire Department is charged also with enforcing the Fire Code set out in the Administrative Code. (See, Administrative Code § 15-101.) The Fire Department must enforce the provisions concerning the approved number of people in places of assembly, the obstruction of aisles, corridors and exits, the maintenance of fire prevention and extinguishing equipment and devices, as well as exit and directional signs, emergency lighting and exits, and the safety requirements applicable to places of assembly. (Administrative Code §§ 27-106, 27-923 — 27-981, 27-522 — 27-549, 15-101 [b].) To enforce the regulations periodic inspections must be made of buildings (Administrative Code § 27-211), and places of public assembly. (Administrative Code § 27-4256.) Despite the comprehensive nature of these published provisions, none regulate the way in which fire inspections are to be conducted. Furthermore, the People introduced no evidence *933 of unpublished regulations or departmental internal memoranda or procedures about the conduct of the inspections. The prosecutor relied solely on the testimony of Detective Crane to establish the legality of the entry into the club and the entry and search of the back room.
Detective Crane’s explanation did not supply information sufficient to satisfy the People’s burden. The People did not show, based on Crane’s testimony or other evidence, how the locations were selected for inspection, whether based on a formula for randomness, or some objective factor, so that individual discretion was avoided. There was no evidence given concerning the authorized frequency of inspections of a particular location. Thus, there is no evidence about the administrative basis for selecting this club for inspection. The inspection could have been based entirely on the unlimited discretion of some unspecified official, when it is the regulations that must set the standards for targeting locations and the number of times the inspection may take place. (People v Keta, 79 NY2d, supra, at 499-500.)
Further, there was no evidence of any regulation concerning the composition of an inspection team. Crane explained that his team consisted of two uniformed police officers, three or four plainclothes men, a sergeant, and one fireman. There is no explanation of what was the usual composition of an inspection team or whether in this case the team police officers were represented in unusually high numbers.
There was no evidence of how the inspectors were to obtain entry into the premises. Here, the team’s announced entry was of the Police Department, and only afterward was it added that they were there to do a fire inspection. There was no proof that entry based on an announcement of police presence was the authorized practice.
Further, there was no evidence about regulations dealing with scope of the search, who was to supervise the search or who was to make the decisions about how to proceed. Crane said he understood the firemen were to inspect the buildings to make sure they have rear exits, and to see if there were "flammables.” He also understood it was the responsibility of the Fire Department to examine every part of the club. However, the sources of his knowledge were undisclosed. He did not refer to any rule or regulation or even to an oral instruction from a supervisor or person in a policy position.
There is no evidence to show that regulations authorized *934 the inspection of locked rooms, and there was no evidence to show that if such inspection was authorized, the official procedure for unlocking doors. The fireman checked the back door, the bathrooms and behind the counter. There was no evidence that he wanted to check the locked room. There was no evidence to show if a fireman would unlock a door or if a police officer was authorized to do so. Crane provided no justification for opening the door other than his function to provide security for the fireman. He did not recall that the fireman on the team had given him any instructions and there was no evidence that the fireman was either in danger or that he had requested someone at the club to open the door and that his instruction had been disobeyed. There was no evidence of a rule authorizing use, without consent, of the key of a person to open a door to a private room. There was no evidence of authority by a police officer to enter the room to inspect when he was not trained to do an inspection.
Thus, the People failed to prove how often the clubs were inspected, on what basis the clubs were designated for inspection, the instructions to the inspection team, the composition of the team, who was in charge of the team, what was to be examined, how the examinations were to take place, whether the person in charge of the club was to be located, whether locked areas were to be inspected and, if so, the procedure for obtaining admission to such area, and how to act if permission was not granted. In short, the People failed to show anything about the regulations applicable to a fire inspection. The defect is demonstrated by comparing this case with the detailed discussion of the regulations in People v Scott, which is contained in two of the opinions in that case (122 Misc 2d 731 [Genesee County Ct 1983], affd 63 NY2d 518, 523). The People having failed to meet their burden, the motion to suppress the drugs is granted. Further, because the defendant’s arrest, statement, and search of her purse resulted from the illegal search of the room, the statement and narcotics found in the purse are also suppressed.

. Under the presumption, the trier of fact may assume possession of a narcotic drug by a person when that person is in close proximity to the drug in open view in a room under circumstances evincing an intent to unlawfully package or prepare for the sale of the substance.

. The test used is determined by balancing the level of intrusion against the significance of the State’s interest in making the intrusion. (Compare, Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, supra, with Matter of Caruso v Ward, 72 NY2d 432, supra.)

. Each City agency is authorized to adopt rules to carry out its powers and duties pursuant to specific procedures. These include notice, opportunity to comment, review by the City Council and publication. Publication of these rules is proof of their authenticity. (Administrative Code § 1-104.)