OPINION OF THE COURT
Ronald A. Zweibel, J.
On November 22, 1996, December 3, 1996, December 16, 1996 *746 and January 8, 1997, a Mapp-Huntley hearing was held before me. Four witnesses testified. Officer James McSwigin, Sergeant John Zahoras and Police Officer Maribel Stein testified for the People. Louis Escaño testified on defendant’s behalf. Despite some minor inconsistencies between the testimony of the witnesses, I find the witnesses, on a whole, to be credible.
FINDINGS OF FACT
The Taxi and Livery Robbery Inspection Program
Sergeant John Zahoras, a street crimes detectives’ squad supervisor, explained that the Taxi and Livery Robbery Inspection Program (TRIP) allows cab drivers who join the program to voluntarily place police stickers on the left rear and right rear windows as well as inside the cab. The sticker inside the cab should be placed where the passenger is able to see that the cab is participating in the TRIP. The program was instituted in response to a rash of robberies of cabs and murders of cab drivers in 1992 and 1993.
The program attempts to ensure the safety of cab drivers by obtaining their prior consent to be stopped by the police for the purpose of conducting a quick safety check. The stop consists of the officer asking the driver if everything is okay and making a visual inspection of the interior of the cab. The officer may ask the driver at that time if he may open the back doors of the cab as part of that visual inspection.
The police department informed the cab companies and their drivers of this program by holding fairs. At the fairs the community patrol officer would encourage the representatives of the companies and individual drivers to come into the precinct and register their cabs with the program. If a driver wanted to join the program and was properly licensed, the officers at the fairs would sign the driver up. If not, the officers would give the driver a safety brochure and instruct the driver on the various policies and programs available. (Various forms and brochures relating to the TRIP were admitted into evidence.)
The sign-up officer transcribes the forms he fills out into a bound ledger and sends the actual forms to the precinct of record. His ledger is his record of who requested and received a TRIP sticker and to which vehicle the sticker was assigned.
Mr. Escaño signed up for the TRIP on June 10, 1996 at such a fair. His signed forms were sent to the precinct of record in the Bronx and entered into the appropriate ledgers. He was given the stickers which he placed on the windows of his cab.
*747 The July 19, 1996 Stop and Arrest of Defendant
On June 10, 1996, Louis Escaño voluntarily enrolled in the TRIP. The stickers were then placed on Mr. Escano’s car.
On July 19, 1996, at approximately 8:00 p.m., it was still light outside while Officers James McSwigin, Larry Walsh and Christopher Tully were on street crime duty in an unmarked police car and dressed in plain clothes.[1] While on patrol, Officer McSwigin, who was the driver, observed a black Lincoln livery cab driving south on Amsterdam Avenue near 153rd Street. The vehicle committed no traffic violations and had no equipment violations. However, upon noticing TRIP stickers on the back and left passenger windows, Officer McSwigin turned on his siren and flashing lights briefly. (Various photographs of the vehicle showing the TRIP stickers were admitted into evidence.)[2]
Officer McSwigin observed Louis Escaño, who was the owner and driver of the livery cab, move his head as if looking into the rear view mirror. He also saw defendant, who was sitting slouched down in the right rear passenger seat, look over his shoulder at him. The officer saw defendant gesture with his right hand as if to waive Mr. Escaño to continue driving. The livery did not stop. Officer McSwigin turned on his siren to a constant wail and proceeded to follow the livery for approximately 31/2 blocks to 157th Street where the cab finally stopped. Officer McSwigin pulled in behind and also stopped.
As Officer McSwigin was exiting, he saw defendant lean toward the floor of the rear passenger side and bend down. Defendant then sat up and threw something with his right hand onto the front seat. This led Officer McSwigin to believe that defendant might have a weapon such as a gun. Mr. Escaño also saw defendant drop what turned out to be a paper bag onto the front seat.
Officer McSwigin approached the livery on the driver’s side and Officer Walsh approached on the passenger side. Concerned about his safety, Officer McSwigin, upon reaching the livery, without first requesting Mr. Escano’s permission, opened the left rear passenger seat door in order to have a clear and *748 unobstructed view of defendant.[3] The officer looked down in the direction he had seen defendant bend and reach toward and observed a black nylon bag on the left-hand rear passenger side behind the driver. The bag was open and the officer saw clothing and a greenish plastic wrapped around part of a brick, approximately a foot long, which the officer recognized as a way of packaging cocaine.[4]
Upon seeing part of a brick, Officer McSwigin alerted Officer Walsh that there was going to be a possible arrest by saying the code word "doughnut”. Defendant and Officer McSwigin then looked at each other and defendant said, in broken English, "it’s not mine.” Defendant had not been asked any questions nor was he in handcuffs.
Officer Walsh requested that defendant step out of the vehicle. As defendant complied with that request, he looked over toward Officer McSwigin and repeated, without being asked, that "it’s not my coke.” Officer McSwigin had not yet administered the Miranda warnings to defendant.
While defendant was standing outside the cab, Officer Mc-Swigin took out a key and stuck it into the brick which he believed to be cocaine. When he pulled out his key, there was white powder on the key. Officer Walsh handcuffed defendant and Officer McSwigin walked over to the front passenger side door and opened it.
Officer McSwigin was asking Mr. Escaño if defendant had thrown anything into the front seat, when he looked down and saw a brown paper bag containing money on the front seat. Before Mr. Escaño could answer the officer’s first question, the officer asked him whether it was his package. When the driver said the package was not his, the officer asked him to whom the package belonged. The driver just looked in the direction of the back seat. The officer recovered the bag which contained $9,284 in currency in various denominations. Officer McSwigin also recovered the black nylon bag, 10 green plastic bricks of cocaine, 6 pieces of assorted clothing, a cellular phone, a mini-calculator, a page net beeper and an ID card. (All of the recovered items were introduced into evidence at the hearing *749 and Officer MeSwigin demonstrated how the items were placed in the black nylon bag for the court.)
Officer MeSwigin at some point told Mr. Escaño, who spoke broken English, that the officers were checking to make sure that he was okay and to ask how his night was going. The driver did not protest the stopping of the vehicle.
CONCLUSIONS OP LAW
Defendant challenges the stop of the cab, the seizure of the bag containing, amongst other things, 10 kilos of cocaine and the paper bag containing United States currency, the voluntariness of his statements and his arrest. The People concede that the stop of the livery was a seizure (People v Ingle, 36 NY2d 413, 418 [1975]) and that defendant, as a passenger in the livery, has standing for purposes of deciding the instant challenges to the actions of the officers. (See, People v Millan, 69 NY2d 514, 516 [1987]; People v King, 159 AD2d 306 [1st Dept 1990].)
An individual vehicle may be stopped based on reasonable suspicion of a violation of the Vehicle and Traffic Law. (See, People v Ingle, supra, 36 NY2d, at 419.) Routine checks on a vehicle may also be premised on reasons other than traffic violations. These checks enable the State to protect its vital and compelling interest in safety on public roads and streets. However, such routine stops usually must be based on "some nonarbitrary, systematic procedure to verify compliance with the law. This may be done randomly, but even then by some system or uniform procedure, and not gratuitously or by individually discriminatory selection.” (People v Ingle, supra, 36 NY2d, at 416; see, People v Scott, 63 NY2d 518, 525-526 [1984].) The procedure should be uniform, leaving little discretion to police officers. (See, People v Scott, supra, 63 NY2d, at 526.)
Defendant’s first challenge in this case is to the constitutionality of the TRIP. This court has inspected the documents and forms utilized by this program. According to the testimony, the TRIP was instituted to promote the safety of taxi and livery drivers throughout the New York City area and was implemented pursuant to written guidelines. The guidelines set forth what action the officers may take upon stopping a vehicle pursuant to a TRIP decal. The program itself is voluntary and encompasses a preventive police response to crimes against taxi and livery drivers by authorizing safety checks of participating vehicles displaying TRIP decals. Participating drivers register *750 for the program by filling out a consent form giving their consent to the police in advance to stop their vehicles.
Upon observing a TRIP decal, the police may "briefly stop and visually inspect that vehicle”. If the driver consents, the visual inspection may include opening the passenger compartment of the vehicle. The guidelines limit how the officers may proceed with respect to passengers in the taxi absent independent factors causing the officers to fear for their safety. I find that the guidelines supply objective nondiscriminatory standards for enforcement and is valid under the State and Federal Constitutions. (Cf., People v Scott, 79 NY2d 474, 500-502 [1992]; People v Davis, 156 Misc 2d 926, 930-932 [Sup Ct, Bronx County 1993].)
Unlike most other programs, this program is voluntary and obtains the consent of the driver in advance of the stop. Consent is clearly an exception to the warrant and probable cause requirements of the Fourth Amendment. (See, People v Gonzalez, 39 NY2d 122, 127 [1976].) Moreover, there is nothing inherently wrong in obtaining a person’s consent in advance so long as the consent is voluntary.
Here, participation in the program was strictly voluntary and required a driver to enroll in it. By enrolling in TRIP, the driver is specifically consenting to surrender his constitutional right of privacy in an effort to stop crime against taxi/livery drivers. (Cf., People v Genn, 144 Misc 2d 596, 600-601 [Sup Ct, Bronx County 1989].)
Furthermore, balancing the intrusion caused by a safety stop pursuant to TRIP on an individual’s Fourth Amendment interests against the State’s promotion of legitimate governmental interests (see, Delaware v Prouse, 440 US 648, 656-657 [1979]; People v Scott, supra, 63 NY2d, at 525), any such intrusion was minimal and within constitutional limits. Preventing robberies and murders of taxi/livery drivers is indisputably an important governmental interest. Participation in the program is voluntary and consensual and is done pursuant to specific written procedures. (Cf., People v Davis, supra, 156 Misc 2d, at 930 [observing that administrative searches must be circumscribed by rules to guarantee certainty and regularity of governmental action].) Additionally the decals give the passenger actual notice of the cab’s participation in the program. Therefore, this court finds the TRIP is constitutional.
The next question to be answered is whether the program was constitutional as applied in this case. The People bear a heavy burden of proving the voluntariness of the consent. (See, People v Gonzalez, supra, 39 NY2d, at 128.)
*751 As the Court of Appeals has observed, consent is voluntary when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle. (See, People v Gonzalez, supra, 39 NY2d, at 128.) Whether consent has been voluntarily given must be determined from the circumstances. (People v Gonzalez, 39 NY2d, at 124.)
This court finds that the People have met their burden of proving Mr. Escaño consented to the stop of his cab. Mr. Escaño attended a fair where the police were signing people up for the TRIP of their own volition. He enrolled in the program for his own protection while he was driving a livery. That he made this decision is credible given the rash of robberies and shootings of cab drivers over the last few years. Moreover, Mr. Escaño testified credibly that he wanted the police to be able to stop him to ensure his safety and that he did not object to the stop in question.
The question now becomes whether the officers had a right to open the rear passenger door following a consent stop to check on the driver’s safety. According to the police guidelines, the officers, upon seeing a TRIP sticker, could stop the vehicle to check to see if the driver was safe and do a visual inspection of the vehicle. The officers could open a rear door only if the officer obtains consent from the driver at the time of the stop. While the police failed to request Mr. Escano’s permission to open the rear passenger door, Mr. Escaño indicated that he believed that by putting the TRIP stickers on his vehicle’s windows he had consented to the police searching his cab as well as stopping it. It is apparent from Mr. Escano’s testimony that had the police asked before opening the door he would have given them his consent. However, this court cannot simply overlook the failure of the officers to follow the guidelines. (Cf., People v Davis, supra, 156 Misc 2d, at 930-932.)
The only real question in this case then becomes whether the police had reasonable suspicion to open the rear passenger door without first obtaining Mr. Escano’s consent as required by the guidelines. What constitutes reasonable suspicion varies from case to case. In determining whether the police conduct was reasonable, the court must balance the State’s interest against the defendant’s interest in being at liberty and free from unreasonable searches and seizures. (See, People v David L., 56 NY2d 698 [1982]; People v John BB., 56 NY2d 482, 487 [1982].)
*752 While there are no specific published cases dealing with the TRIP, the cases dealing with whether the safety check stops of cabs are lawful seem to go both ways. (See, People v Gomez, 165 Misc 2d 197, 200-201 [Sup Ct, Queens County 1995]; People v Carty, 164 Misc 2d 275, 280 [Sup Ct, Queens County 1995]; compare, United States v Santiago, 950 F Supp 590 [SD NY 1996]; People v Concepcion, 216 AD2d 141, 142 [1st Dept 1995].) However, all of those cases are distinguishable based on the fact that none of those cases involved previously obtained consent of the driver to stop the cab.
Moreover, prevention of crime is as necessary to law enforcement as its detection. (See, People v Carty, supra, 164 Misc 2d, at 280.) Here, pursuant to the driver’s action in placing the TRIP stickers in the vehicle’s windows, officers may reasonably interpret this to mean that the driver wished to ensure his own safety by consenting to the police stopping him.
When defendant apparently realized the cab was being stopped, the police observed him attempting to waive Mr. Escaño on. Officer McSwigin observed defendant lean toward the floor of the cab and throw a package onto the front seat of the cab. Mr. Escaño verified that defendant threw a package onto the front seat. This court finds that defendant’s actions in gesturing the cab driver to continue, ducking down and then throwing a package onto the front seat constituted a reasonable basis under the circumstances to believe that something unusual and suspicious had occurred.
This articulable reason justified the officer’s action of opening the rear door even without obtaining Mr. Escano’s prior consent. (See, e.g., People v McLaurin, 70 NY2d 779, 781-782 [1987].) Officer McSwigin had a right and a duty to protect both himself and Mr. Escaño. As both the United States Supreme Court and the New York Court of Appeals have recognized, a police officer faces an inordinate amount of danger as he approaches a person seated in a vehicle. (See, Pennsylvania v Mimms, 434 US 106, 110 [1977]; People v Robinson, 74 NY2d 773, 775 [1989]; People v Troiano, 35 NY2d 476, 478, 482 [1974] [concurring opn by Rabin, J.].) The opening of the door of a vehicle has been noted to lessen substantially the risk of injury to the officer from the use of a gun by a passenger. (See, People v Robinson, supra, 74 NY2d, at 775.) It cannot be said that the "search”, i.e., the mere opening of the car door, was unreasonable given the officer’s observations. Therefore, this court finds that the opening of the door was a minimal intrusion into defendant’s expectations of privacy, *753 and was justified by the need to secure the officer’s and Mr. Escano’s safety.
Upon opening the door, Officer McSwigin observed what he believed to be a brick of cocaine in the open bag at defendant’s feet. The brick in the bag was in plain view. (See, People v Beriguette, 84 NY2d 978, 980 [1984]; People v Diaz, 81 NY2d 106, 110-111 [1993]; see also, Horton v California, 496 US 128, 136-137.) When the officer alerted his partner, defendant denied ownership of the bag and when ordered out of the car, defendant said "it’s not my coke.” I find that this statement was spontaneously and voluntarily made. It was not made in response to questions put to defendant by the officers nor was it in any way coerced by the officers. (See, Rhode Island v Innis, 446 US 291, 300-301 [1980]; People v Rivers, 56 NY2d 476, 479 [1982].)
At this point the officers had probable cause to arrest defendant based on Officer McSwigin’s observations and defendant’s statement. (See, People v Beriguette, supra, 84 NY2d, at 980.) Once the officers had probable cause to arrest defendant, the officers could seize the cocaine. The officer’s action in then inserting a key into the brick to verify that they were in fact dealing with alleged cocaine was nothing more than an investigatory, confirmatory action. The defendant was properly arrested and the property properly seized. Therefore, the motion to suppress the property seized from the cab and defendant and to suppress defendant’s statements is denied in its entirety.

. Mr. Escaño contradicts Officer McSwigin’s claim that it was still light when Mr. Escano’s livery was stopped. Mr. Escaño said it was already dark at that time. To the extent their testimony contradicts the other, I am crediting the officer’s testimony.

. Officer McSwigin testified that there were three TRIP stickers on the car although at the time he stopped the vehicle he only noticed two of them.

. Mr. Escaño indicated that he thought by joining the TRIP he had consented to the actions of the police and that had the officer asked, he would have consented to the opening of the cab’s door.

. Mr. Escaño testified that as Officer McSwigin and Officer Walsh approached the livery from opposite sides, a third officer walked behind the car, hit the trunk and told Mr. Escaño to open it. Mr. Escaño says he then opened the trunk.