OPINION OF THE COURT
Kathleen M. Rogers, J.
*936 On May 16, 2005 this court conducted a hearing to determine the legality of the stop of defendant’s vehicle by Border Patrol agents at a temporary checkpoint, his subsequent detention pending the arrival of a State Police officer with a drug-detecting dog, and defendant’s eventual warrantless arrest for first degree criminal possession of marihuana (Penal Law § 221.30).
Findings of Fact
At 12:49 p.m. on April 20, 2004 agents of the United States Border Patrol (Department of Homeland Security) were operating a temporary checkpoint near the conjunction of United States Route 11 and State Route 812, in the Town of DeKalb, in this county. The location had been used periodically in the past by these and other Border Patrol agents for the same purpose. The location was near a business known as Diesel Dan’s Truck Stop. This location is also about 25 miles from the international border between the United States and Canada. On this particular occasion the agents were briefly questioning the drivers of all southbound (or westbound) vehicles. One such vehicle was defendant’s gray 2000 Mercury Marquis, in which he was the sole occupant.
Agent Cynthia Pena was the first to testify. She told the court that the checkpoint was operated pursuant to written guidelines for traffic checkpoints, contained in a policy and procedures manual which she had read. According to her uncontradicted testimony, the procedures in the manual were followed at this checkpoint on this date, although the manual itself was not introduced in evidence.
While staffing the checkpoint, Pena stood in the middle of the road. Agent Robert Long was standing there with her, for safety and backup purposes. At least one other Border Patrol agent, and a deputy sheriff were also present, though their role, if any, is unclear. When defendant pulled forward into the “primary” interview area, Pena asked him where he was going, the purpose of his travel, and where he was coming from. White told Pena that he was coming from Massena, and was on his way to Syracuse for an iron workers’ meeting. Pena asked White for identification, which he gave her. She did not recall what type of identification White gave. At this point Long told Pena to direct White to the side of the road for “secondary” questioning. As defendant White pulled to the side of the road, the next car pulled forward into the checkpoint. From this driver’s identification Pena learned that this driver, too, was named White. That *937 vehicle was also directed to pull over for secondary questioning. Pena had no further contact with defendant after directing him to pull to the roadside for secondary questioning, although she observed Long’s questioning of defendant White in the secondary interview.
Cross-examination established that Pena had participated in other temporary checkpoints at this same location on other days. Pena explained the difference between fixed and temporary checkpoints, and noted that her office — based in Ogdensburg, New York — did not operate any fixed checkpoints. She noted that, in her own previous law enforcement experience in the southwestern United States, fixed checkpoints had cemented signs set up in the ground. This particular location near Diesel Dan’s had been in regular and frequent use as a temporary checkpoint since December 2002.
The checkpoint was set up using road marker cones and three signs in each direction, advising of the checkpoint, to the east and to the west of where the agents stood in the road. The policy was to stop each vehicle and to question each driver. Although Pena was generally familiar with what she described as the procedure for setting up and operating the checkpoints, she did not have a policy manual available for reference during her testimony, and therefore could not be specific about the exact procedure which was required to be followed.[1] She could not say what questions she was supposed to ask under the guidelines, but said that this is a decision for the agent to learn from experience. Since Pena could not identify the specific requirements of the guidelines as to operation of the checkpoint, defense counsel moved to strike her testimony that it was operated according to the guidelines. The motion was denied, but the court ruled that this fact affected the weight to be accorded to Pena’s testimony.
*938 Continuing to describe the checkpoint signs, Pena testified that the three signs, and the checkpoint itself, were all visible in a straight line, as required by guidelines. The sign farthest from the checkpoint in each direction was approximately one-quarter mile before the checkpoint. Pena did not know who set up the checkpoint signs on this particular occasion. Pena said that the signs were located by reference to marks on the pavement, but she did not know who put them there or whether they were even visible on this occasion. She did not see the marks that day. She also did not know why that location was chosen for a checkpoint, but said that a record is kept, with a traffic counter, of the number of vehicles passing through the checkpoint. Later in her testimony Pena noted that the guidelines require that the checkpoint be set up on a main highway or corridor leading from an international port of entry into the United States, in this case Ogdensburg, New York. She did not know what sort of records were kept. She had never made a record of how many people were referred to secondary inspection at this checkpoint.
When asked what was her mission in being at this checkpoint, Pena said that “[o]ur mission is to detect and deter illegal aliens or people in illegal activity with weapons of mass destruction.” (Transcript at 29/24-30/2.) Pena expressed the belief that this was the sole mission of this checkpoint.
When asked why she referred defendant White to secondary inspection, she said it was because Long had told her to do so. She asked Long why he wanted this done, and he told her that “he was suspicious, him and the vehicle behind him.”
On redirect, Pena clarified that defendant White tendered a Canadian driver’s license as his identification before he was referred to secondary inspection. When Pena learned that defendant’s surname was White, she told Long to do further checks “because the name White is coming out a lot over the radio.” After Pena referred defendant Brian White for secondary questioning, Long told Pena that the two drivers (Brian White and Raymond White) were “communicating with each other and pointing at us” (transcript at 48/7-10).
The second and only other witness was Border Patrol Agent Robert Long. Long reported that he noticed that defendant White’s vehicle, the gray Mercury Marquis, had New York license plates. The car immediately following the Marquis was a dark blue Chevrolet Impala, also licensed in New York. While listening to Pena question the occupant of a car in front of defendant’s car, Long saw defendant apparently trying to com *939 municate with the driver of the Impala by looking in the rear-view mirror, shrugging, putting his hands in the air. The Impala driver was holding a cell phone in one hand and was making hand gestures.
Long described the purpose of the checkpoint as “looking for terrorists, implements of terror, smugglers of aliens and contraband, and violators, persons violating immigration status.” (Transcript at 53/3-5.) He confirmed that because of his having seen the apparent hand gestures he wanted Pena to refer both vehicles- to secondary inspection so that he, Long, could talk to the drivers.
Before questioning defendant, Long asked Pena what defendant had told her. She reported defendant’s earlier response to Pena that he was going to a union meeting in Syracuse. When Long repeated the questions previously asked by Pena, defendant replied that he was going to the union hall to line up jobs for the next day. Asked who was the union steward, defendant said he only knew his name as “John.” Defendant said he did not have a union card. When Long asked for a license from defendant, he presented his Ontario license and a New York vehicle registration. Long ran radio checks on both documents. Long’s best recollection was that the registration came back in the surname of Lazore, though Long could not be sure of that fact at the hearing. White told Long that the vehicle belonged to his uncle. Long described defendant’s appearance during the secondary interview this way: eyes wide open, shaking when he handed Long the license and registration. Long thought the trembling was more extreme than is typical of most people’s nervousness when questioned by law enforcement officers during á vehicle stop.
Over defense objection the prosecutor asked whether Long had previously encountered the name of White in connection with Long’s work. Long replied that “there is another subject I read arrest report on with last name of White who had been arrested for carrying a large sum of cash that was believed to be drug money.” (Transcript at 57/17-19.) Long also said, over objection, that the name Lazore was also familiar in connection with smuggling. Long said that the fact that defendant had an Ontario license and a New York registered vehicle was significant to him because it is common for smugglers to drive vehicles that don’t belong to them. Long said he was not involved in the secondary questioning of the driver of the blue Impala.
At this point Long asked defendant White what he had in the trunk, and asked if he could have a look. Defendant told Long *940 that he (White) did not want him looking in the trunk. Long told defendant that he (Long) already had a State Police dog coming. Long testified that he wanted a further inspection, so he asked defendant why he did not want Long to look in the trunk. White said he had some expensive car audio speakers in there, although Long noted that the vehicle appeared to be equipped with factory-installed stereo in the dashboard. Long testified that he called for a dog and handler while he was doing the radio check on White’s license and registration. The dog handler was coming from Massena, some distance away from the checkpoint. While doing the license check, Long learned that defendant had a prior conviction for petit larceny, and also had a suspended New York driver’s license.
Long noted that the other Border Patrol agent, named Rosario, did the secondary interview of the driver of the blue Impala. This person turned out to be Raymond White, defendant’s brother. Apparently Raymond White consented to a vehicle search, which produced no contraband.
About 50 minutes after defendant was first stopped and referred to secondary interview, State Trooper Kevin Beattie arrived, with his trained drug-detecting dog, Cully. The dog did an external vehicle sniff search, and alerted on the front right corner of the trunk lid. Long then searched the trunk and found two duffle bags, one large and one smaller. Both contained alleged hydroponic marihuana.
On cross-examination Long confirmed that the agents keep a checkpoint log, in which they record the number of vehicles that pass through the checkpoint. He did not bring that log to the hearing. Called an “After Action Report,” the record reports traffic numbers and any incidents that occur during the checkpoint operation. The record is maintained at the sector headquarters, in Swanton, Vermont. Long was unaware whether the record identified the number of detected illegal aliens or people caught smuggling aliens. Long helped set up the checkpoint on the day when defendant was stopped. Describing the signs posted in connection with the checkpoint, Long said that the first (in each direction) was a stop ahead sign, then a Border Patrol sign, then about 200 feet from the checkpoint another stop ahead sign, and stop sign at the checkpoint itself. All signs were portable. He confirmed that there were markings on the road to assure correct placement of the signs. Long indicated that during his time on the job in this area since December 2003 there was one other temporary checkpoint operated by the *941 Border Patrol, on United States Route 11 on the St. Lawrence County-Jefferson County line, to the south of the checkpoint at which defendant was stopped.
Asked if there were any written guidelines about the checkpoints or how many times one had been used in this location, Long said that he was not authorized to discuss operations in terms of where and when checkpoints will be used. Long was quite specific that this was a temporary, not a permanent checkpoint. He said that he was not authorized to discuss why this location was chosen for a checkpoint.
Defense counsel pressed Long as to the purpose of the checkpoint. He confirmed that in addition to checking a person’s immigration status, the agents were watching for alien smugglers and for contraband, including narcotics and marihuana as forms of contraband. Asked why the apparent hand signaling was suggestive of terrorists or people smuggling aliens, Long said that the facial expressions of the drivers prompted his suspicions, suggesting to him a mixture of frustration and an attempt to communicate between vehicles. Long conceded that most people are somewhat nervous when stopped by a police officer, but found that White seemed noticeably more nervous than most people. It also seemed suspicious to Long that White did not know the name of his union contact in Syracuse.
Long confirmed that White said he was a United States citizen, a fact which Long verified. Long could not confirm that the particular Lazore who owned the car driven by White was the same Lazore whose name Long recognized in connection with smuggling. Later he changed his testimony to say that the radio check gave information seeming to connect the particular Lazore who owned this vehicle with smuggling, and with the White family. (Transcript at 81/4-6.) The connection with the name White was not specific to this defendant. Long also confirmed that at the time of requesting the radio records check he suspected narcotics smuggling.
Long stated clearly that he was already suspicious of White and possible drugs before the time when White said anything about speakers in the trunk as a reason for not letting Long look inside. After doing what he described as a Terry search (pat-down frisk and observation of reachable area of the car for possible weapons), and finding nothing, Long told White to wait in his vehicle. At this point Long believed that he had enough information to justify holding defendant for the arrival of Trooper Beattie with the dog. This suspicion, Long confirmed, was *942 based on White’s answers to questions, his apparent nervousness, and the observed hand movements and what Long interpreted as hand signals to the other car.
Long confirmed that he had read guidelines for conducting temporary checkpoints in a Border Patrol handbook. He said that every Border Patrol agent has one; he did not know whether this was public information or not. He said that the Border Patrol supervisor selected sites for the checkpoints, and the individual agents were not free to set them up wherever they might choose.
Conclusions of Law
In United States v Martinez-Fuerte (428 US 543 [1976]), the Supreme Court established that Border Patrol agents may stop a vehicle for brief questioning of its occupants at a reasonably located permanent checkpoint, even if there is no reason to believe that the particular vehicle contains illegal aliens. The agents may refer motorists selectively to a secondary inspection area on the basis of criteria that would not sustain a roving patrol stop, even if such referrals are made largely on the basis of apparent Mexican ancestry. (See 3A Am Jur 2d, Aliens and Citizens § 119 [Interrogation Stops at Permanent and Temporary Checkpoints] [description of the holding].)
This rule is not dependent on the checkpoint being deemed the functional equivalent of the international border. Indeed, in Martinez-Fuerte the checkpoint was not the functional equivalent of the border. ‘ ‘ [F]unctional-equivalency status depends entirely on the nature of the traffic passing through [the checkpoint] . . . [T]o justify searches at checkpoints labeled the functional equivalent of the border, the government must demonstrate with reasonable certainty that the traffic passing through the checkpoint is international in character.” (Annotation, What Constitutes Functional Equivalent of Border for Purpose of Border Exception to Requirements of Fourth Amendment, 94 ALR Fed 372, § 18 [International character of traffic passing through checkpoint].) In Almeida-Sanchez v United States (413 US 266 [1973]), the Supreme Court held that a checkpoint within the United States near the border or at points marking the confluence of two or more roads which might extend from the border could be the functional equivalent of the border under certain circumstances. (See also, United States v Jackson, 825 F2d 853 [5th Cir 1987].) These cases are mentioned here, despite the fact that the validity of the checkpoint stop in *943 this case does not depend on the functional equivalent of the border theory, because some of the testimony bears a striking resemblance to the Almeida-Sanchez description of where a functional equivalent checkpoint might properly be established.
In United States v Johnson (2001 WL 1313727, 2001 US Dist LEXIS 16973 [ND NY, Oct. 18, 2001]), the District Court decided a case involving a charge of transporting illegal aliens for financial gain, arising out of a temporary Border Patrol checkpoint remarkably similar in some respects to the one at bar here. The Johnson checkpoint was a temporary one, despite the defense argument that it was actually a roving patrol stop; it was located on United States Route 11 in the Town of Antwerp, Jefferson County, New York, slightly south of the confluence of two major roads leading south from the United States-Canadian border, and this location had been used on numerous previous occasions for checkpoints. The checkpoint was marked by traffic cones, signs, flashing lights and floodlights and was staffed by uniformed Border Patrol agents. Johnson told the agent during primary inspection that she was a United States citizen, that she met her passengers in the St. Regis Mohawk Indian casino, and that she was driving them to Syracuse, New York. The front seat passenger answered a question about his nationality nervously and in broken English, saying that he was an American. The vehicle was then referred to secondary inspection. During the secondary interview both Johnson and the passenger admitted that each man in the car had paid Johnson in Canadian funds to drive them from the border to the Regional Transportation Center in Syracuse. The stop and the arrest were upheld. The court noted that there are no substantive differences between permanent and temporary checkpoints, citing Michigan Dept. of State Police v Sitz (496 US 444, 450-453 [1990]). The Johnson court also drew a sharp distinction between checkpoints and roving patrol stops, noting that the latter are considerably more intrusive than the checkpoint stop, and therefore require articulable facts warranting suspicion. (See Delaware v Prouse, 440 US 648 [1979]; People v Scott, 63 NY2d 518 [1984].)
The Court of Appeals also noted in Scott that while it is axiomatic that a checkpoint stop is a seizure within the meaning of the Fourth Amendment, it is also true that a motorist has a diminished expectation of privacy in an automobile (citations collected at 63 NY2d 518, 524-525 [1984]). “[I]ndividualized suspicion is not a prerequisite to a constitutional seizure of an *944 automobile which is carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.” (Id. at 525 [internal quotation marks omitted]; also see People v Sinzheimer, 15 AD 3d 732 [3d Dept 2005] [appellate court approved the operation of a temporary Border Patrol checkpoint operated in a uniform manner, even though the guidelines as to operation of the checkpoint were not placed in evidence at the suppression hearing].) In Sinzheimer the agent testified that the primary purpose of the checkpoint was to determine the citizenship of vehicle occupants. When questioned by the agent, defendant changed his story as to where he was born. The agent asked to search the trunk and defendant consented, opening the hatch. The agent smelled marihuana, resulting in defendant’s arrest and later guilty plea.
The Border Patrol checkpoint stops are supposed to be brief unless supported by reasonable suspicion that a crime has been committed. It is not necessary, though, for the questions to be limited to the topic of citizenship. Agents may properly inquire about a traveler’s alienage and travel plans. (5 LaFave, Search and Seizure § 10.5, at 253 n 298 [4th ed 2004]; United States v Massie, 65 F3d 843 [10th Cir 1995], cert denied 525 US 830 [1998]; United States v Rascon-Ortiz, 994 F2d 749 [10th Cir 1993].)
Although the Border Patrol agent may properly ask about criminal conduct (for example, possession of drugs) if he or she has a reasonable suspicion of such activity,[2] that did not occur here. Neither Pena nor Long verbalized to defendant White their belief that he might be involved with contraband in the form of some sort of drugs. Part of the legal backdrop for analysis of a drug-related checkpoint stop grows out of the fact that, in Indianapolis v Edmond (531 US 32 [2000]), the Supreme Court held that the use of checkpoints whose primary purpose was drug interdiction is unconstitutional. In that case, the Court distinguished Martinez-Fuerte because of the special “problems of policing the border.” (Id. at 41.) Still unclear (and there are conflicting federal decisions, none from this circuit) is the answer to the question whether a Border Patrol checkpoint is *945 valid when its primary purpose is the enforcement of immigration laws and its secondary purpose is drug interdiction.[3]
The court finds that the temporary checkpoint by Border Patrol agents was authorized and properly conducted, under authority of Martinez-Fuerte. Analysis now focuses on the remaining questions of (1) whether the Border Patrol agents had reasonable suspicion, at the point when the secondary inspection interview was complete and White had refused permission for a search of the trunk, that White was carrying marihuana; (2) whether defendant’s detention at the checkpoint site for 50 minutes pending arrival of Trooper Beattie and Cully was reasonable; and (3) whether Cully’s sniff search, alert, and resulting search and seizure of alleged hydroponic marihuana were proper.
In United States v Martinez-Fuerte, the Supreme Court authorized brief detention at a checkpoint.[4] The New York Court of Appeals has analyzed the permissible duration of a traffic stop. In People v Banks (85 NY2d 558 [1995]), the Court held that:
“For a traffic stop to pass constitutional muster, the officer’s action in stopping the vehicle must be justified at its inception and the seizure must be reasonably related in scope, including its length, to the circumstances which justified the detention in the first instance (United States v Sharpe, 470 US 675, 682; see also, Florida v Royer, 460 US 491, 500 [plurality opn]). While the stop was justified in the instant case, the length and circumstances of the detention were not. Consequently, the evidence ultimately seized must be suppressed.” (85 NY2d 558, 562 [1995].)
Part of the analytical framework for reviewing the legality of the detention here involves People v Hollman (79 NY2d 181 [1992]). Hollman involved the distinction between a level one and level two encounter between a citizen and the police, as articulated in People v De Bour (40 NY2d 210 [1976]). Authority for a policeman to ask nonintrusive questions requires only an objective, credible reason for the questions, not necessarily indicative of criminality. The level two inquiry, called a common- *946 law right of inquiry, is activated by a founded suspicion that criminal activity is afoot, and permits somewhat more intrusive inquiry. Only with a level three reasonable suspicion that a particular person was involved in a felony or a misdemeanor is the officer permitted forcibly to stop and detain a person, and only with probable cause to believe the person has committed a crime may he be arrested without a warrant. (Hoilman, 79 NY2d at 184-185.) Since Hollman was not an automobile case and since neither the De Bour level one nor level two interactions involves a Fourth Amendment seizure, it may seem off the mark to review it here. Yet each of the New York appellate cases mentioned below in connection with automobile stops followed by detention of the motorist mentions both Banks and Hollman. And four of the five cases analyze the detention in terms of whether there was a founded suspicion of involvement in a crime.
In the present case it is important to clarify that the authority to conduct and operate the checkpoint is analyzed as a matter of federal constitutional law as interpreted in the federal courts, because the stop was initiated by federal officers and their authority for the checkpoints derives from their particular duty to enforce the immigration laws.[5] However, the arrest of defendant was effected by state officers, and the prosecution is pending in state court. Hence, the legality of the detention, the dog sniff “search” and the arrest must be guided by Fourth Amendment and New York constitutional jurisprudence as interpreted both by New York and federal courts.
As in Banks, in the present case the stop was valid initially, and brief detention of the defendant was authorized. At that point the agents knew the following facts: defendant was seen trying to communicate in some fashion with the vehicle behind his; he produced an Ontario driver’s license while driving a New York-registered car; he told the agents that he was driving to Syracuse to arrange a union job for the next day; he could not remember the full name of the union steward he was going to see; the radio check disclosed that defendant had a prior record for larceny and had a suspended New York driver’s license; and the agents recognized the name of the particular Mr. Lazore whose car defendant was driving as associated with smuggling, and recognized defendant’s surname, though not necessarily defendant personally, in connection with drug traffic. *947 Based on this information, Long called for Trooper Beattie and Cully, well before the conversation in which Long asked, and defendant refused (as was his right), to let Long look in the trunk. The record in this case shows that the request for a dog search was made before the interview was concluded. Little if any interaction between the Border Patrol agents and White took place after the secondary inspection was finished and before Trooper Beattie and Cully arrived.
These facts could certainly lead an experienced law enforcement officer to suspect that there was something going on that would invite a closer look. That, however, is not the constitutional test for valid detention. The facts can also be viewed more neutrally. It is not illegal to have an Ontario driver’s license while operating a New York-registered vehicle. The fact that a motorist is named White and is driving a vehicle owned by someone named Lazore does not establish that White was carrying drugs. As the officers acknowledged on cross-examination, citizens differ in their degree of nervousness in response to questions from policemen, particularly when the questions become accusatory or pointed in their focus. The fact that White could not remember the name of his union steward does not establish either that he was lying or that he simply had a bad memory. It is simply a piece of information.
New York appellate cases differ, based on differing fact patterns, as to whether and when post-stop detention is authorized. In People v Woodfolk (267 AD2d 410 [2d Dept 1999]), the Court simply notes that the detention was illegally prolonged, citing Banks. In People v Berberena (264 AD2d 670 [1st Dept 1999]), officers made a traffic stop and then noted allegedly nervous behavior of a minimal and equivocal nature which the Court, citing Banks, found insufficient to justify a clearly accusatory inquiry and request to search the trunk from which a weapon was recovered. In People v Barreras (253 AD2d 369 [1st Dept 1998]), the Court held that once a traffic summons had been issued after a vehicle stop, and without more information justifying a founded suspicion that criminal activity was afoot, the police were not authorized to detain defendant further.
On the other hand, in People v Coutant (16 AD3d 772 [3d Dept 2005]), the Court upheld a conviction finding that police officers had a founded suspicion for requesting permission to search the vehicle (defendant consented). State officers on routine patrol observed a vehicle on the other side of the road, parked in the travel lane. The officers turned around, ap *948 proached the car and saw defendant, apparently asleep inside, very scantily clothed, with apparently pornographic magazines on the seat beside him. The officer told defendant to get dressed and step out of the car. He then asked where defendant was coming from, and where he was going. The response seemed inconsistent with his location. The officer asked further questions, and defendant said he was just driving around. Defendant then took (and passed) a field sobriety test, and consented to a search of his vehicle. This produced a box of ammunition, a bag containing marihuana pipes and a loaded .22 caliber gun under the driver’s seat. The Court affirmed defendant’s conviction by plea to a weapon charge. Of significance here, the appellate court found that the officer had a founded suspicion of criminal activity afoot based on his observations after approaching the vehicle, and acquired this suspicion before his justification for detaining defendant had been exhausted.
In People v Tejada (270 AD2d 655 [3d Dept 2000]), defendant conceded that the car in which he was a passenger was validly stopped by police for a traffic infraction. When the driver could not produce a license or registration, the trooper asked the driver to step out of the vehicle, and then asked defendant his name, date of birth, where he was coming from and his destination. He asked who owned the vehicle and asked for the names of the passengers. The trooper also noted some damage to the vehicle. Defendant said the car was involved in an accident somewhere on the highway but he did not know the location. Someone told the trooper that one of the passengers was named Larsen, but that person identified himself as Maseppa. None of the vehicle occupants produced identification, so the trooper detained them all while he ran a records check by radio. The records check revealed an outstanding warrant on Maseppa and on a “Pedro Tejada.” Later follow-up disclosed that the arrest warrant concerned a different individual with the same first and last names but a different middle initial. The Court found that the officer’s questions never went beyond a De Bour level one inquiry, a reasonable request for information. It was not invasive and was not focused on criminality, and was permissible on these facts.
In the present case, when Long called for Trooper Beattie and Cully to come to the scene, clearly Long suspected a drug trafficking case. There would have been no other reason to ask Beattie to bring the dog. The court finds that Pena’s and Long’s questions through and including the secondary inspection *949 interview were appropriate to the level of information available to them, but that neither of them had a founded suspicion of criminal conduct afoot.
The court does not read Woodfolk, Berberena, Barreras, Coutant and Tejada as being in conflict with each other. They simply present different fact patterns, and therefore produce different results. The court finds the facts of the present case analytically similar to Woodfolk, Berberena and Barreras, and therefore finds that Agents Pena and Long did not have a founded suspicion of criminality when they detained White for the eventual dog sniff. They may have had the sort of hunch that experienced police officers develop, but that is not enough to justify nearly a one-hour detention arising out of a checkpoint stop by Border Patrol agents. It is of course axiomatic that the fact that the search ultimately produced results does not validate the procedure used.
In view of this finding, the court need not decide whether the dog sniff search was valid. If the court were to reach that issue it would uphold the sniff alert procedure in light of the recent Supreme Court holding in Illinois v Caballes (543 US —, 125 S Ct 834 [2005]); United States v Waltzer (682 F2d 370 [2d Cir 1982]); and United States v Dillon (810 F Supp 57 [WD NY 1992]). Although Caballes involved some post-stop delay pending arrival of a drug-detecting dog, the Supreme Court accepted the lower court’s finding that the duration of the detention was entirely reasonable based on the traffic offense that resulted in the stop, and the “ordinary inquiries incident to such a stop.” (Caballes, 543 US at —, 125 S Ct at 837.)
The motion to suppress the seized marihuana is granted on the ground that its seizure grew out of an unreasonably long detention after an initially valid checkpoint stop.

. In the course of doing background research for this opinion the court discovered two reports in the on-line archives of the Plattsburgh Press-Republican newspaper reporting on a September 19, 2004 crash at a permanent Border Patrol checkpoint on Interstate 1-87 in the Town of North Hudson, Essex County. Nineteen vehicles including a bus were involved, and four people died. Based on its hearings into the crash, the National Transportation Safety Board called for the urgent adoption of uniform guidelines for the operation of Border Patrol checkpoints. (See Kim Smith Dedam, NTSB Says Precautions at Checkpoint were “Not Effective, ” Press-Republican [Plattsburgh, N.Y.], Oct. 25, 2004; Suzanne Moore, National Standards Proposed, Press-Republican [Plattsburgh, N.Y.], Mar. 13, 2005.) This information was not in evidence at the hearing and therefore leads to no inference or conclusion about the proof in this case.

. See United States v Preciado-Robles, 964 F2d 882 (9th Cir 1992); United States v Sanders, 937 F2d 1495 (10th Cir 1991); United States v Benitez, 899 F2d 995 (10th Cir 1990); 5 LaFave, Search and Seizure § 10.5, at 254 nn 299, 302 (4th ed 2004).

. 5 LaFave, Search and Seizure § 10.5, at 254 nn 299, 302 (4th ed 2004).

. 428 US 543 (1976); United States v Sugrim, 732 F2d 25, 29 (2d Cir 1984); see discussion in Kamins, New York Search and Seizure, at 409-419 (Roadblocks and Roving Patrols [Patrol Stops]), at 417 (15th ed 2005).

. See discussion in United States v Massie, 65 F3d 843 (10th Cir 1995), cert denied 525 US 830 (1998).