OPINION OF THE COURT
Jerome J. Richards, J.
Defendants were both charged with acting in concert in the alleged possession or transportation of unstamped cigarettes, contrary to Tax Law § 1814 (c) (2), a class D felony. On November 8, 2012, the court dismissed the indictment with respect to defendant Thompson, finding that the evidence showed nothing more than that he was present in the vehicle when it was stopped. The People were given leave to re-present, but advised the court that they did not intend to do so.
On May 10, 2013, the court conducted a suppression hearing to inquire into the reasonable suspicion or probable cause for the arrest of defendants, and the voluntariness of the ensuing statement given by Mr. Jock to Trooper Loveland. The court makes the following findings of fact and conclusions of law.
Findings of Fact
Brian Hotz testified that he is a Border Patrol agent, and has worked in that capacity for more than 16 years, serving in this county since March 2012. He noted that his work involves detection and arrests for alleged cross-border smuggling, cigarettes and illegal aliens, much of the illegal traffic coming through the St. Regis Mohawk Reservation, known as Akwesasne.
On May 31, 2012, Hotz was working a swing shift and was in charge of a temporary checkpoint with traffic control cones and portable stop signs. There were four or five Border Patrol agents staffing the checkpoint, which Hotz described as being an immigration checkpoint on US 11 in the Town of Rossie, near the county line between St. Lawrence and Jefferson Counties. The checkpoint involved vehicles traveling west on US 11. The procedure for operation of the checkpoint was that the initial, or primary inquiry involved asking the vehicle occupants if they are United States citizens. While not every car was stopped, the majority were. Sometimes vehicles were allowed to pass without questioning in order to prevent a blockage in traffic. If the agent at the primary station had concerns, he or she would direct the vehicle to secondary inspection in the same area, but to the side of the road and outside the stream of traffic.
*459 Hotz identified Jock in court as a person who was stopped at about 6:30 p.m. at the checkpoint. Jock was driving a Dodge Ram pickup towing a U-Haul trailer. Jock had a passenger, later determined to be Thompson. At the primary checkpoint station Jock had a brief conversation with Hotz, said he was a United States citizen and that he was coming from Hogansburg. Hotz asked Jock what was in the trailer, Jock told him the cargo was cigarettes, and he was going to Syracuse. Hotz asked about the passenger’s citizenship, and then directed the vehicle to secondary inspection. Hotz was shown Jock’s driver’s license, and had another officer run it for a radio check for outstanding warrants (none reported). Hotz was in uniform and did not un-holster his sidearm. The primary checkpoint conversation lasted two or three minutes.
At the secondary inspection Jock remained in the vehicle. He was asked what was in the trailer, and Jock responded that he was transporting cigarettes for his wife’s company. Hotz asked if he could take a look in the trailer, and Jock said “sure.” After Jock opened the trailer, Hotz saw a large quantity of what appeared to be cigarettes. Hotz asked if he could inspect them, and Jock again said “sure.” He opened a case and a carton, and looked at the cigarettes. Hotz did not have special training in identifying unstamped cigarettes. Hotz called Senior Agent Kenna to look at the cigarettes, and Kenna told Hotz that the cigarettes were not tax stamped. The trailer was not locked or sealed before being opened during the inspection. Hotz asked Jock if he had any documentation making his possession or transportation of the cigarettes legal, and he said “no.”
Hotz notified Alcohol, Tobacco, Firearms and Explosives (ATF) Agent Dickey about the situation, but ATF declined to become involved with the case, so Kenna called the State Police. Trooper Loveland responded. The secondary inspection process lasted for approximately five minutes. Kenna did not recall how long the checkpoint was in operation. Hotz received no adverse information concerning Jock from the record check. Hotz recalled that Jock seemed nervous, his voice was shaking, and the pitch of his voice changed, when Hotz asked him to come to the back of the trailer.
On cross-examination by Mr. Piasecki, Hotz said that the purpose of the checkpoint was related to immigration, checking citizenship and whether noncitizens were legally in the country. He was reasonably certain that Jock was a United States citizen when he said that he was. He took possession of Jock’s license *460 during the questions, as a precautionary measure so that the agents would have a motorist’s identification if he were to flee. He also used the license to determine where Jock lived. He remembered asking the passenger about his citizenship, but does not recall whether he asked for identification. Hotz did not recall Jock’s residence address. Hotz asked Jock where he was coming from, and was told “Hogansburg.”
Still on cross-examination, he repeated that the primary purpose of the checkpoint was to check immigration status of vehicle occupants, and that the people in a stopped vehicle are not free to go until given permission by the agents. Hotz said that the secondary inspection was apart from the immigration check.
Hotz acknowledged being familiar with Miranda warnings, and said that he did not give any to Jock, because he did not contemplate his being prosecuted. He also said that Jock was free to go, despite the fact that Hotz still had Jock’s driver’s license. Hotz did not inquire into Jock’s ethnic origin, and said that he had not received any particular training on stopping people “from the reservation.” He said he did not know that Jock is a Native American.
Hotz also said that his inquiry about the trailer contents had nothing to do with immigration. No other law enforcement officer participated in the questioning of Jock. Hotz did not recall specific information about the volume of traffic flowing through the checkpoint that day. He said he was satisfied that the passenger was a United States citizen.
On redirect examination Hotz said that the checkpoint was also for interdiction of drugs and cigarettes.
New York State Trooper Patrick Loveland testified that he has been a trooper for 10 years, and that he was working on May 31, 2012. He first met Mr. Jock that day. He identified Mr. Jock in the courtroom at the hearing. He was called to the Border Patrol checkpoint in the Town of Rossie by Agent Kenna, arriving there at about 7:30 p.m. The checkpoint was set up on US 11, near the county line between Jefferson and St. Lawrence Counties. He saw a truck with a trailer and two male subjects, one of whom was Jock. Loveland looked inside the trailer after talking with Jock. When Loveland arrived, Jock was sitting in the driver’s seat, and he stayed in the vehicle while Loveland talked to him. Loveland was in uniform, which included a bolstered sidearm.
*461 Loveland asked Jock where he was coming from and where he was going. Jock said he was coming from Black Canyon Distribution Center in Hogansburg and was going to Skydancer Smoke Shop in Seneca Falls, New York. Jock showed Loveland a trailer rental contract. Loveland did not administer Miranda warnings at the checkpoint. Loveland described Jock as compliant at the checkpoint, saying that he answered Loveland’s questions. The Border Patrol agents showed Loveland the contents of the trailer. Loveland opened some boxes, found cigarette cartons, and inside the cartons he saw packs of cigarettes. Love-land asked Jock about tax stamps for the cigarettes, and Jock told him he did not need one because he was transporting them from one Native American reserve to another. Loveland went to his patrol vehicle in order to consult with a State Police investigator. He spoke with Investigator Roda. The process of consulting with Roda and evaluating the situation took several hours. Jock remained in his vehicle. Loveland did not give Jock any directions, did not take his cell phone or tell him that he could not use it. Loveland said that Roda advised him to arrest Mr. Jock. Upon doing so Loveland administered Miranda warnings. He did not have any conversation with Jock after the warnings. Jock was handcuffed and placed in Loveland’s vehicle. Jock’s vehicle remained at the roadside location.
On cross-examination by Mr. Aldrich, Loveland said that he was initially called by the Border Patrol agents about a stop involving illegal or unstamped cigarettes. He acknowledged that defendants were not free to go. Loveland denied any knowledge about Jock’s purported consent to search the trailer. He administered the Miranda warnings at 10:30 p.m., but did not know when defendants were initially detained. At no time did Loveland see the trailer detached from the truck.
Conclusions of Law
A checkpoint stop of a moving vehicle is a seizure for Fourth Amendment purposes. (People v Scott, 63 NY2d 518 [1984].) Unlike an investigative stop supported by reasonable suspicion of criminal activity, assuming that the law enforcement officers operating the checkpoint have a legitimate legal reason for operating the checkpoint, they are not required to have individualized suspicion about the vehicle or its occupants before making the initial stop at the checkpoint. (See discussion in Kamins, 1-5 New York Search & Seizure § 5.02 [4] [a] [Matthew Bender rev ed].) As noted by Justice Kamins,
*462 “In determining whether a particular roadblock or roving patrol is reasonable, the New York Court of Appeals has adopted an analysis utilized by the United States Supreme Court in Brown v. Texas [(443 US 47 [1979])]. Brown enunciated a balancing test in which a court must weigh: (1) the gravity of the public concerns served by the seizure; (2) the degree to which the checkpoint or roving patrol effectively addresses those concerns; and (3) the severity of the intrusion on individual liberty.” (Ibid.; see also People v Abad, 98 NY2d 12, 16 [2002]; Matter of Muhammad F., 94 NY2d 136 [1999]; People v Deer, 39 Misc 3d 677, 684 [St. Lawrence County Court 2013].)
The court will consider the purpose of the roadblock in determining its validity. (Indianapolis v Edmond, 531 US 32 [2000].) Here the facts established at the hearing show that this roadblock had several purposes: to check the citizenship and immigration status of vehicle occupants near the international border, to detect evidence of smuggling, if any, and more generally to detect criminal conduct. Although checkpoints, when operated in a uniform and non-arbitrary manner, are constitutionally permissible, they must also serve a permissible purpose, and will only permit brief questioning without a founded suspicion of criminal conduct. (People v Sinzheimer, 15 AD3d 732, 733-734 [3d Dept 2005].)
When a Border Patrol agent refers a motorist to secondary inspection in the context of a border search, the intrusion on personal liberty has been held to be minimal. (People v Fisher, 97 AD2d 651 [3d Dept 1983].) However, once the questioning at the checkpoint, whether at the primary or secondary station, satisfies the agent that the vehicle occupants are not illegal aliens and do not appear to have crossed the border illegally, and do not appear to be carrying contraband based on facts apparent to the agent at that moment in time, the basis for detaining the motorist ends. Absent reasonable suspicion of criminal activity, the agent has no permissible basis on which to detain the motorist or passenger further. (People v Trotter, 28 AD3d 165 [4th Dept 2006], lv denied 6 NY3d 839 [2006]; People v Banks, 85 NY2d 558 [1995].)
The basis for detaining and questioning defendant further ended when Jock told Hotz at secondary inspection that he had cigarettes in the trailer and that he was going from the Akwesasne Reserve to the Seneca Smoke Shop. This information *463 gave rise to no reasonable inference of criminality in the possession or transportation of the cigarettes. (See People v White, 8 Misc 3d 935 [St. Lawrence County Court 2005].)
Since the agents had no founded suspicion of criminality at the time of the checkpoint stop the court need not and does not reach the question of the voluntariness of consent to the search of the trailer. The Border Patrol agents and the State Police had no permissible reason to ask for such consent. The fruits of the search and any statements obtained after Jock told Hotz that he had cigarettes in the trailer and where he was going are therefore suppressed from use at trial.